Commonwealth *v.* Zimmerman, Appellant.

62

Argued December 9, 1968. Before WRIGHT, P. J.,
WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING,
and HANNUM, JJ.

*Abraham J. Brem Levy*, with him *William O'Donnell*, for appellant.

*Richard A. Devlin*, Assistant District Attorney,
with him *Henry T. Crocker* and *William T. Nicholas*,
Assistant District Attorneys, *Parker H. Wilson*, First
Assistant District Attorney, and *Milton O. Moss*, District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, March 20, 1969:

On January 11, 1967, Dr. Lamar T. Zimmerman was convicted on a charge of performing an illegal abortion. This is an appeal from the refusal of the trial court to grant defendant's motions for a new trial and in arrest of judgment. The only issue raised is whether sufficient evidence was presented to sustain the guilty verdict.

It is the duty of the court, in considering a motion for new trial and in arrest of judgment, to evaluate the sufficiency of the evidence by reviewing the entire trial record. The evidence must be read in the light most favorable to the Commonwealth, which, by reason of the verdict, is entitled to all reasonable inferences arising therefrom. *Commonwealth v. Tabb*, 417 Pa. 13, 207 A. 2d 884 (1965), *Commonwealth v. Moore*, 398 Pa. 198, 157 A. 2d 65 (1959). The effect of such motion is to admit all the facts which the Commonwealth's evidence tends to prove. *Commonwealth v. Tabb*, supra. These facts, however, must be sufficient to justify a verdict based upon guilt beyond a reasonable doubt. If the evidence itself is insufficient, the verdict of the jury does not add any greater weight to it.

The testimony at trial will be set out at length so that the basis for our decision is clear.

The Commonwealth produced five witnesses. Its case was based almost entirely, however, on the testimony of three witnesses. They were: (1) Sarah Yerger, upon whom the abortion was allegedly committed, (2) her mother, Elizabeth S. Moyer, and (3) Dr. John Kane.

### SARAH YERGER

Sarah Yerger testified that she was sixteen years of age in April of 1966, at which time she was a high school student.

In March of 1966, Sarah was experiencing irregularity in her menstrual cycle and menstrual cramps, a condition which had persisted for two or three years. Although she had been under the treatment of another doctor for this condition, she became a patient of Dr. Zimmerman at the direction of her mother, who had been his patient for several years.

Sarah was first examined by defendant at his office on March 1, 1966, at which time her past history of irregular menses was discussed. As a result, defendant prescribed medication which tended to relieve her cramps but did not bring on her period.

Sarah returned to defendant's office on six different occasions for additional treatment. All of these appointments were held during regular evening visiting hours, with a receptionist and attending nurses present. All of these appointments were recorded in the doctor's file and a fee of four or five dollars was charged for each visit.

During her second visit, on March 10, 1966, Sarah admitted to the doctor that she might be pregnant. On March 20, 1966, Dr. Zimmerman instructed Sarah to take a urine specimen to the Memorial Hospital for a pregnancy test. The doctor provided her with a note to the hospital on his prescription blank.

On April 11, 1966, at about 10:45 p.m., Sarah was instructed by her mother that she was to visit the defendant at 11:00 p.m. that evening. She was not informed of the purpose of the visit and was feeling well at that time. When she arrived with her mother at the office, defendant was not present. Several minutes later he arrived and, after greeting them said, "He was going to open up or enlarge the mouth of the womb and inject it."

Sarah disrobed, in the presence of her mother, and lay down on the examination table. She next testified

that Dr. Zimmerman "inserted something in me which I don't know what it was"; that she didn't experience any liquid being inserted; and "it was something that was solid in state." Her legs were propped up and draped with a sheet at that time so that her vision of the lower half of her body was blocked. She also testified that when this solid object was inserted in her she experienced no pain.

She remained upon the table for five or ten minutes and, upon arising, was given a sanitary pad for her bleeding. The doctor told her to go home and call him if a fever developed.

The next night she had a fever and her mother called Dr. Zimmerman who instructed his nurse to telephone a prescription to a pharmacy in Royertown. Sarah took the medicine, was relieved and, thereafter had no problems.

### MRS. ELIZABETH MOYER

Mrs. Moyer's testimony essentially corroborated Sarah's insofar as it related to Sarah's condition and visits with Dr. Zimmerman.

Mrs. Moyer testified that she was notified by Dr. Zimmerman that her daughter was pregnant some time in March. She then spoke with Dr. Zimmerman, although she did not recall whether the conversation was by phone or at his office. Mrs. Moyer's testimony was as follows: "Q. . . . what, if anything, did you say to the defendant? A. I asked him if anything could be done. Q. What did he say? A. He said there is a possibility. Q. What was the rest of your conversation with him? A. Not too much, just making arrangements when I could bring her. . . . Q. What did the defendant say? A. He said it could be a possibility that she could be helped. . . ."

Her testimony further reflected that she prevailed upon the doctor to have the appointment at 11:00 p.m., because her work was over at 10:45 p.m.

Mrs. Moyer was unable to see what the doctor did when Sarah was on his examination table.

Mrs. Moyer also stated that she discussed money with the doctor who mentioned a fee of $200.00. However, defendant never asked her for the money, the money was never mentioned on the night of the alleged abortion, and she has never paid anything to him.

### Dr. John R. Kane

Dr. John R. Kane, testified that he was the physician at Sacred Heart Hospital who examined Sarah upon her admission on April 15, 1966. The results of his examination showed that Sarah was in the process of aborting. The following day, Dr. Kane performed the surgical procedure of dilation and evacuation of the uterus and discovered "degenerative placental tissue." This indicated "an incomplete miscarriage, and an incomplete abortion medically." When asked: "Are you able to determine, Doctor, from your examination and treatment of this patient, what, if anything, caused this miscarriage? He answered: "A. I can't medically say what was the cause of the miscarriage."

The court found that there was sufficient evidence to support the jury verdict based on the following facts: (a) Defendant's conversations with the mother. (b) The doctor knew that Sarah was pregnant. (c) The reference to $200.00 when all prior fees had been $4.00 or $5.00. (d) The appointment for 11:00 o'clock at night when no one else was present. (e) The failure of the doctor to enter these facts on his medical record. (f) Sarah's bleeding after their visit, and her subsequent fever.

It is true, of course, that a conviction may be sustained by circumstantial evidence when the evidence is such as reasonably and naturally justifies an inference of guilt. The evidence, however, must be of such volume and quality as to overcome the presumption of innocence and to satisfy a jury of the accused's guilt beyond a reasonable doubt.

The Supreme Court stated in *Commonwealth v. Clinton*, 391 Pa. 212, 137 A. 2d 463 (1958). "Where conviction must be based on circumstantial evidence, as it must be here, the theme of guilt must flow from the facts and circumstances and be consistent with them all."

Similarly, the Supreme Court said in *Commonwealth v. Bausewine*, 354 Pa. 35, 41, 46 A. 2d 491 (1946), that such a conviction cannot be allowed to stand: "It must be remembered that the guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony. The facts and circumstances proved must, in order to warrant a conviction, be such as to establish the guilt of the defendant, not necessarily beyond a moral certainty, nor as being absolutely incompatible with his innocence, but at least beyond a reasonable doubt."

In our opinion, the circumstantial evidence in this case does not establish guilt beyond a reasonable doubt. The testimony of the Commonwealth witnesses allows various conclusions, each equally plausible. While the jury has the right to accept or reject such testimony as it deems appropriate, it may not allow surmise or conjecture to serve as the basis for its decision.

A careful review of the record reflects that at no time did either mother or doctor mention the possi-

bility of an abortion but only "if anything could be done." This statement alone was subject to varying interpretations in light of the daughter's prior menstrual problems, and may have related solely to the easing of her pain.

Moreover, Dr. Zimmerman stated that when he said that Sarah could be helped, he was referring to a diagnostic Dilation and Curettage operation by a registered surgeon for which a standard fee would be $200.00. Mrs. Moyer's testimony did not indicate that the $200.00 was to be paid to defendant.

The fact that the appointment was at 11:00 o'clock at night was not unusual in the circumstances of this case. It was the mother who urged that the appointment be at that hour because her working day ended at 10:45 p.m. The doctor merely acceded to her request. Since Dr. Zimmerman lived above his office and often had patients visit him well into the night, the appointment at this late hour need not take on the criminal connotation ascribed to it by the Commonwealth. In addition, the fact that this visit was held at such a late hour, when no nurse was in attendance, would further explain the failure to enter this visit on the patient's record.

Much was made of Sarah's testimony that Dr. Zimmerman had inserted a "solid object." This testimony would not contradict Dr. Zimmerman's statement, however, that he had inserted a vaginal speculum which is a metal object regularly used for routine pelvic examinations.

We also take note of the testimony of Sarah that, "He was going to open up or enlarge the mouth of the womb and inject it." She further testified that she experienced neither pain nor discomfort during the examination or immediately afterwards. No comment was made on this fact by the Commonwealth. Yet, Dr.

Apostolidis, who testified for Dr. Zimmerman, unequivocally testified that a woman who had never been pregnant before and had not received medication to alleviate pain would experience moderate to severe pain either immediately or a few minutes after treatment if the mouth of her uterus were stretched and a fluid injected.

Finally, reference is made to Sarah's bleeding and subsequent fever in an attempt to show that this resulted from an illegal operation. Dr. Zimmerman's testimony indicates that he discovered blood in the vaginal canal and upon inspecting the cervix concluded that a spontaneous miscarriage was imminent. Certainly, it is equally possible that the bleeding and fever may have arisen from a spontaneous abortion rather than an illegal one.

In summary, the above evidence submitted by the Commonwealth was vague and indefinite, allowing of several possibilities other than an attempt to cause an abortion. As we have noted, while we will allow a jury to make a finding of guilt based on circumstantial evidence, we will not allow it to make its decision based on a random choice among various alternatives.

We also wish to point out that the actions of the defendant herein were not those usually associated with a physician performing an illegal operation. For example, to ascertain whether Sarah was pregnant, he sent her to the hospital with a note on his own prescription pad requesting a pregnancy test. All parties are agreed that Dr. Zimmerman never billed her for the $200.00, nor did she pay any sum whatsoever. When Sarah had a fever two days later, defendant did not hesitate to telephone an antibiotic prescription to a local pharmacy in his own name. All of these facts suggest a directness and openness of action, in total accord with the ethical conduct expected of a physi-

cian, which is contrary to the conduct regularly found in cases involving clandestine, illegal operations.[1]

Accordingly, we find that the verdict was against the weight of the evidence. A new trial, therefore, will be ordered.

Judgment of sentence vacated and new trial ordered.

WRIGHT, P. J., dissents on the opinion of Judge HONEYMAN below.

MONTGOMERY, J., dissents.

---

[1] We note, in passing, that approximately thirty character witnesses, including educators, manufacturers and a chief of police testified as character witnesses on behalf of defendant.