## Commonwealth *v.* Clinton, Appellant.

Argued November 11, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Claude Olwen Lanciano,* for appellant.

*Juanita Kidd Stout,* Assistant District Attorney, with her *Thomas M. Reed,* Assistant District Attorney, *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 16, 1958:

On the night of October 24, 1954, at about 11:45 o'clock, Eugene Clinton and Thomas Houser were arrested by Philadelphia police and later charged with the crimes of Possessing Burglars' Tools (Act of June 24, 1939, P. L. 872, §904, 18 P.S. §4904) and Prowling (Act of June 24, 1939, P. L. 872, §418, added May 27, 1949, P. L. 1900, §1, 18 P.S. §4418.) They were tried before Judge KUN of the Court of Quarter Sessions, Philadelphia County, without a jury and convicted. Clinton appealed to the Superior Court which affirmed his conviction and then petitioned this Court for an allocatur which was allowed. Houser did not appeal.

On the night of his arrest, Clinton was seen, at the corner of 23rd and Manning Streets, to get into an Oldsmobile automobile in which the police found 4 electric drills, a screwdriver, a hatchet, electric razor, and a crowbar. Houser was arrested on the street. He had in his possession two clocks, three electric bits and a chisel. Being questioned at detective headquarters about the tools in his car, Eugene Clinton explained that he worked for his brother, Edward Clin-

ton, who was in the business of installing television and high power aerials, and that the tools in question were used in that work.

At the trial, the defendant's brother, Edward Clinton, corroborated what Eugene had said, and identified all of the tools, which had been found in Eugene's car, as belonging to him. Referring to the items he testified: "This is a common cold chisel for cutting work. We do some metal work in supports and stuff like that. These are common, ordinary high-speed bits that we use . . . These are crowbars that we use. in ceiling work when they are remodeling. We work with the electricians and contractors." When the Trial Judge asked him to demonstrate how the crowbar was used he replied: "Supposing you had 2 by 4s coming this way and we wanted to put something behind them. I would go at it this way, and you can also use it this way with the other end. You see, you have leverage here, where you don't have it here."

The Court questioned further and Edward replied: "Q. That is good enough. Now, how about the little hatchet. A. The little hatchet is a common thing. I, myself, use a smaller hatchet because I have a regular belt that I use to hold all my tools for certain things. There are times when we might want to nick out a little bit. Q. How about the drills? A. We had about 14 inches of concrete to go through over here and we went through that—Q. You mean at Callahan's? A. Yes. What we had to do was put a television in the wall and everything had to be concealed, so we took it from the basement up to the bar to keep the cables concealed. It involved work with the walls."

The two Clinton brothers had worked on a job that day, and had ceased operations about 6 p.m. The tools were left in the car, Edward explained, because: "With heavy equipment such as this, I don't always take it

out of the car. I have a couple of set-ups and if I have one in the car, I usually leave it there."

Eugene Clinton, the defendant, testified that he had used the indicated tools that day on the job described by his brother, and that after dinner, he drove to 5033 Woodland Avenue, a used car lot where Houser worked as an auto mechanic. At this place Houser did some repair work on Eugene's car and then they both got into the car to test out the repair work. When they arrived at 23rd and Manning Streets, Eugene asked Houser to let him drive. Houser stopped the car and they both got off so as to exchange places.

Since Houser's case is not before us, there will be no need to relate the circumstances attendant upon his arrest. As already stated, Judge KUN found both defendants guilty. The record fails to establish that the Commonwealth made out a prima facie case against Eugene Clinton on either the Burglary Tool charge or the Prowling charge.

The learned Trial Judge said in his Opinion filed under Rule 43 of the Superior Court that it was not satisfactorily explained why the two defendants should have been trying out a car which they had fixed "near midnight, some 50 or 60 blocks from where they lived." A man charged with crime is not required to explain anything. It is the Commonwealth's obligation to prove guilt. When an accused person is confronted with incriminating evidence which, if unexplained, will work a conviction, he remains mute at his peril, but when the evidence submitted by the Commonwealth does not rise to the dignity of authoritative accusation, much less proof of guilt, the Commonwealth may not declare that the silence of the accused, if he prefers not to speak, supplies deficiencies in the prosecution's case. Even if the defendant does speak and speaks unconvincingly or self-contradictory, but the Common-

wealth has not made out a prima facie case, a resulting conviction will not be allowed to stand. Nevertheless, it is difficult to understand why, if Clinton and Houser were out testing a recently-repaired car, there would be anything unreasonable about their being 50 or 60 blocks from their homes.

Regardless of Eugene Clinton's explanation as to why he was out in his car "near midnight", the finding of certain tools in his car did not make out a conviction under the Act of June 24, 1939, P. L. 872, which provides, inter alia: "Whoever has in his possession any tool, false-key, lockpick, bit, nippers, fuse, force-screw, punch, drill, jimmy, or any material, implement, instrument or other mechanical device, *designed or commonly used* for breaking into any vault, safe, railroad car, boat, vessel, warehouse, store, shop, office, dwelling house, or door, shutter or window of a building of any kind, with the intent to use such tools or instruments for any of the felonious purposes aforesaid, is guilty of a misdemeanor . . ." (Emphasis supplied).

The Commonwealth failed to present any evidence whatsoever that the tools found in Clinton's car were "designed or commonly used for breaking into any vault, etc.," an indispensable feature in a conviction under this statute. In affirming the conviction of the Court of Quarter Sessions, the Superior Court said, with reference to Clinton's tools: "If they are suitable for felonious breaking and entering, it is immaterial that they can be adapted also for lawful uses." This is not the law. There are many tools and implements which are suitable for felonious breaking and entering, the possession of which would not subject the possessor to criminal prosecution. Saws, hammers, nails, tongs, awls, knives, mattocks, scythes, files, pliers, gimlets, pincers, wrenches, gauges, and spatulas, all can be used

for breaking and entering a house, but they still retain their non-criminal status. With the countless types of do-it-yourself kits, there are hundreds of other tools and instruments which are supposed to be of service to the mechanically or non-mechanically inclined householder in holding his house together, keeping the plumbing operating, and preventing the roof from caving in. Even a corkscrew can be employed to get into a house, but the law would come to a sorry pass indeed if the possessor of a corkscrew had to prove that the corkscrew on his key ring had no purpose other than that of opening ketchup and more fluent bottles.

Of course, the Superior Court did follow up the statement heretofore quoted, with another statement, namely, "The intent to use the tools for any of the felonious purposes set forth in the Act may be inferred from all of the circumstances of the case." This utterance is a correct announcement of the law but if the criterion of its applicability were to be based on the facts in this case, it would not be a correct statement of the law. The circumstances in the case at bar do not support a criminal intent. Where conviction must be based on circumstantial evidence, as it must here, the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all.

The conviction in this case is based wholly on inferences, suspicions and conjectures. This Court said in *Commonwealth v. Bausewine,* 354 Pa. 35, 41, that such a conviction cannot be allowed to stand: "It must be remembered that guilt must be proved and not conjectured. The reasonable inference of guilt must be based on facts and conditions proved; it cannot rest solely on suspicion or surmise. These do not take the place of testimony . . . The circumstantial evidence in this case is not such 'as reasonably and naturally to justify an inference of the guilt of the accused. . . . and

of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt.' ".

The lower Court completely disregarded the factor of reasonable doubt in this case. If the Trial Judge did not accept the defendant's explanation of the suspicious circumstances as true, he could not ignore the fact that the concatenation of events, all leading to a reasonable explanation of the suspicious circumstances, could not help but raise a reasonable doubt of guilt. Reasonable doubt is neither excessively timid nor excessively bold. It is not to be gauged by the actions of the man who would hesitate to cross a bridge resting on concrete piers and suspended by indestructible steel; nor by the actions of the man who would cross a bridge against fifty angels warning him that the piers had crumbled and the spans had fallen. Reasonable doubt is the doubt of a reasonable man. When the reason, like a bird flying over the sea, looks in vain for a substantial object on which to rest and fold its wings of perplexity, it can be said that the mind is in a state of reasonable doubt.

It would appear that the Trial Judge settled whatever doubts perplexed his mind by landing where he had no right to land at all. He said in his Opinion that Eugene Clinton had a criminal record, one "including charges of possession of burglary tools." It should not be necessary to point out in boldface type that a defendant has the right to have the charges against him considered on the evidence presented on the current indictment and not on what he did some time in the past. A defendant may have been guilty of a previous crime and yet be entirely innocent of the charges of today.

The Trial Judge said further: "It is quite clear that the defendant Clinton has used his apparently proper

relationship with his brother to cover up his misdeeds committed many hours in the night after his work with his brother was done."

There is nothing in the record to support such declaration. And then the final sentence in the Trial Judge's Opinion reveals more than anything else that his conclusions went beyond the record in the case. He said: "There have been many such situations disclosed in the courts." What may have happened in other "situations disclosed in the courts" could have no possible application to the case before him for decision.

Eugene Clinton was also found guilty of prowling. The relevant Statute provides: "Whoever at night time maliciously loiters or maliciously prowls around a dwelling house or any other place used wholly or in part for living or dwelling purposes, belonging to or occupied by another, is guilty of a misdemeanor." It will be observed that to convict under this statute the Commonwealth must prove: (1) A loitering or prowling; (2) at night; (3) around a dwelling house.

The only element of this crime which the Commonwealth proved was that Clinton was out at night. So far as the other two elements were concerned, they slumbered in the night of non-existence. Clinton was neither loitering or prowling and he was not around a dwelling house. He was on the street about to get into an automobile.

Judgment of sentence reversed.

---

Dissenting Opinion by Mr. Justice Chidsey:

The tools being carried by Clinton and Houser at the time of their apprehension were undoubtedly such as would bring this case within the Act of June 24,

1939, P. L. 872, §904, 18 PS §4904, if the prerequisite "intent to use such tools . . . for any . . . felonious purposes . . ." can be shown. Intent, of course, being a state of mind, can only be determined by a consideration of *all* of the relevant circumstances. The majority opinion fails to set forth that at the time of apprehension Clinton *denied knowing* Houser or being with him. Houser denied knowing Clinton. Houser, it was later admitted, was in fact Clinton's brother-in-law! Clinton's possession of the drills, crowbars, etc., in his car was explained to some extent as being connected with his brother's television repair business, but the possession of the bits to fit these drills on Houser's person remained quite unexplained. Taking all the circumstances into consideration, I find myself in agreement with the unanimous Superior Court (opinion at 183 Pa. Superior Ct. 111) that the court below had sufficient facts before it to find that the necessary intent had been established and that defendants were guilty of the crime of Possession of Burglary Tools under Section 904 of The Penal Code of 1939.