Commonwealth *v.* Wilson, Appellant.

22

Argued November 14, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*David C. Harrison,* with him *Mitchell A. Kramer,* and *Kramer & Harrison,* for appellant.

*William H. Wolf, Jr.,* Assistant District Attorney, with him *James Fitzgerald* and *Alan J. Davis,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, August 6, 1968:

This is an appeal, after jury trial and denial of post-trial motions, from the judgment of sentence of life imprisonment imposed by the Court of Oyer and Terminer of Philadelphia County. The facts are set forth in the opinion of the court below:

"At about 6:00 p.m. on Christmas day, 1964, Wakefield Conway, Jr., a 45 year old man, walking westwardly in the 2700 block of Park Avenue (in the area

of Temple University) was stabbed six times by three youths. This 5′ 5¼″ tall, and 131 lb. man fell backward, flat on his back. His wallet was emptied and thrown near his head. The youths fled. There was an abrasion of the left side of the victim's nose, and an abrasion on the right side of his forehead in two places. There were four stab wounds in the stomach area and two stab wounds of the upper right arm and right shoulder. The four stab wounds of the stomach involved a cutting of the small bowel in two places, a cutting of the stomach in two places, and a cutting of the liver and the aorta. The direct cause of his death was the massive fatal blood loss caused by the stab wounds of the stomach.

"He bled to death in the few minutes it took the police to arrive. Later, his wife and the father of the dead man went to the morgue and identified and claimed the body.

"The attack had been witnessed. It occurred in the full light of the illumination of a street light, thirty feet away. Two young girls had been almost directly across the street, less than fifty feet away, watching. Their view was unobstructed. One of these, Emma Holliday, age eleven, got a good look and recognized the assailants as three teenagers she knew very well from the neighborhood. The three robbers she identified were: Marion Wilson, Boise Wright, and Robert McSwain. She saw Marion Wilson actually stab the man.

"Emma Holliday and a girl friend, Cynthia Jackson, had been running west on Seltzer Street toward the 2700 block of Park Avenue. They were running ahead of two boy companions who had stopped in the middle of Seltzer Street to pick up coins that had dropped. On reaching the southeast corner of Park Avenue and Seltzer Street the two girls stopped. Emma's attention was directed across the street, and,

leaning over a hood of a car parked on Park Avenue, she looked and saw three young men encircle a man. One of the three boys, Marion Wilson, raised a shiny bladed knife in his hand and brought it down, stabbing the man. The man fell from his standing position onto his back. As this man [lay] motionless and quiet, Marion Wilson put his hands into the man's pockets and then put his hands back into his own pockets. Then Marion Wilson ran south on the sidewalk and ducked into an alley, following his two companions. Emma Holliday went home and told her mother and father what she had seen. Her father told her to forget about it and not tell anyone. The next night Emma told the police of what she saw.

"Emma Holliday had known Boise Wright for the past six years; she had known Marion Wilson and Robert McSwain for the past three years. All three lived in her neighborhood, which was the neighborhood of the murder. The three boys were friends and were always together. She had seen them about every day during the years she knew them.

"Mr. James Prescott, the step father of Robert McSwain, one of those identified by Emma Holliday, testified that his step son did live in the neighborhood during the years Emma said she knew him. He further testified that his step son, Marion Wilson and Boise Wright went to high school together and were all in the same class and that the three boys were always together everyday. Mr. Prescott testified that his step son and Boise Wright had been together for several hours during the late afternoon of Christmas Day, and that the last time that he saw them they were leaving a home that was approximately a block from the place of the murder—at about the time of the murder.

"When Cynthia Jackson, age 10, looked across the street with Emma Holliday she saw three boys 'around'

some man. She then saw the man fall on his back. Her view across the street was unobstructed. She recognized one of the three boys as Boise Wright.

"She did not know Marion Wilson before this night, although she had some recollection of having seen him in the neighborhood before. She was not sure that Marion Wilson was or was not one of the two other attackers. She did, however, see that one of the other two boys was a dark-skinned colored boy who had 'high hair'. Marion Wilson is a dark-skinned colored young man and he did wear his hair 'high' at the time of the attack.

"Robert Davis, age 14, and William Harris age 12, were the two boys who had been running on Seltzer Street with Emma and Cynthia. When they caught up to the two girls at the corner, the girls were leaning over a car looking across Park Avenue.

"When Robert Davis looked, he saw a man lying on the sidewalk across the street and three boys going through his pockets. Then he saw the three boys run south on the pavement and disappear into an alley. He testified that the three boys were of high school age.

"When William Harris looked across the street, he saw a man lying on the ground and three boys of high school age running away from the body and into an alley.

"Neither Robert Davis nor William Harris had known Marion Wilson, or even seen him before this night.

"The jury found the defendant, Marion Wilson, guilty of murder in the first degree and, after further deliberation, recommended a sentence of life imprisonment."

Appellant lists eleven separate reasons why his conviction should be reversed. In support of his motion in arrest of judgment, he urges that the evidence is insufficient to convict where, of several witnesses, only one, Emma Holliday, can identify the defendant, and

that one witness is of doubtful credibility. Appellant seems to ignore the fact that credibility is for the jury, and the jury resolved the issue against appellant. Nor can we say that no reasonable jury could have believed Emma. On the contrary, despite some inconsistencies in the details of her testimony, Emma at all times positively identified Marion Wilson as one of the assailants. Her testimony, believed by the jury, certainly is enough to support the verdict.

Several of appellant's arguments in support of his motion for a new trial relate to alleged prejudice against him on the part of the judicial machinery of the Commonwealth. We see absolutely no merit in any of these contentions. Appellant claims that the prosecution failed to investigate diligently the possibilities concerning his innocence. Yet he was unable to supply any information whatsoever to the district attorney. We find this contention groundless.

Next appellant alleges that the court below was prejudiced against him, as evidenced by its participation in the examination and by its charge to the jury. With regard to the participation by the trial judge, appellant alleges that the court usurped the role of the prosecutor. Actually, the court was only fulfilling its proper function, by seeking to clarify answers and calm the youthful witnesses. Nothing was said in response to questions by the court by either of the witnesses appellant refers to that was not also stated in response to questioning by the district attorney.

Nor do we find that the charge to the jury was prejudicial. We find no merit in appellant's claim that the charge as a whole was one-sided. Furthermore, the court did not err in instructing the jury that "It's either first degree murder . . . or it's not guilty." Appellant's objection to such a charge is twofold. He claims that this is an invasion of the jury's province of ascertaining the degree of guilt. However, this court stated in *Commonwealth v. Chavis*, 357 Pa. 158,

172, 53 A. 2d 96 (1947), quoting from *Commonwealth v. Sheets,* 197 Pa. 69, 79, 46 Atl. 753 (1900): "An imperative instruction which takes from the jury their right to ascertain the degree is erroneous, but one which points out to them their duty under the law, but leaves them free to act, is not erroneous." An analysis of the *Chavis* and *Sheets* opinions clearly reveals that the instant instruction was proper in merely pointing out its duty to the jury. The trial court did not remove the jury's right to ascertain the degree of guilt; on the contrary, it plainly told the jury what each of the possible verdicts was, and did not exclude the possibility of a verdict of guilty of murder in the second degree or of voluntary manslaughter.

The other objection to that part of the charge is that it assumed that the homicide was done in the perpetration of a robbery, foreclosing the possibility that the intent to rob was not conceived until after the stabbing. Despite appellant's assertion that "there is little citable authority" on the question, his contention was treated directly and dismissed in *Commonwealth v. Hart,* 403 Pa. 652, 658, 170 A. 2d 850 (1961): "Defendant's highly technical argument amounts to this: Unless the Commonwealth proves that the intention to commit a robbery was formed before the beginning of the fatal assault, the evidence cannot amount to a murder which was committed in the perpetration of a robbery. In other words, defendant would require a televised stop-watch in every robbery or felony-killing to prove that the felonious intent existed before the attack. . . .

"In Commonwealth v. Stelma, 327 Pa. 317, 192 A. 906, defendant signed a confession in which he stated that after his victim had hit him in the chest he knocked him down with his fist and then in a drunken rage picked up a stone and hit him in the head several times with the stone. As the victim lay on the ground,

defendant took money from his pockets, but he claimed he never intended to do this until after the victim was lying unconscious or dead. The court in sustaining a conviction of murder in the first degree with penalty of death, said (page 321) : '. . . The defendant's argument that the intention to rob originated subsequent to the assault upon the deceased need not be seriously considered in view of the verdict of the jury. Moreover, even though such were the case, *it is immaterial when the design to rob was conceived,* if the homicide occurred while defendant was perpetrating or attempting to perpetrate a robbery.' " (Emphasis added).

Appellant does not limit his allegations to the misconduct of the prosecution and the court, but also contends that defense counsel did not adequately and competently represent him. This contention is based largely on failure of counsel to object to the admission of certain evidence and various procedures followed by the court. As will be seen later, the court's action in most of the instances complained of was proper, and in any case, was not harmful. The record of the instant case is almost 1,000 pages long. It would be inconceivable to expect a trial lawyer, on the spur of the moment, to make every proper objection. Moreover, failure to object is often a valid tactical move. *Commonwealth v. Thompson,* 367 Pa. 102, 79 A. 2d 401 (1951). See also *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A. 2d 349 (1967). We have examined this record, and it clearly reveals competent assistance of counsel rendered by an experienced trial lawyer.

Two other assignments of error, relating to the composition of the jury, may be disposed of briefly. Appellant contends that the court erred in permitting Juror No. 11 to continue, over objection of both parties, after she took ill while out of court. The juror reported that she was feeling fine, that her condition had arisen before and quickly passes, and that she de-

sired to continue. Under those circumstances, we cannot find an abuse of discretion in permitting her to continue on the jury.

The other objection to the jury composition is a much more fundamental one, directed to what is known as "death qualification" of jurors. Appellant urges that the procedure followed here unconstitutionally excludes a substantial segment of the community from the jury. The recent landmark decision of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770 (1968), however, is determinative of the case and adverse to appellant's position. In that case, the sentence of death was held to be invalid because the State had been permitted to challenge for cause all who said they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it. The instant case is distinguishable from *Witherspoon* on two very important grounds. First of all, in *Witherspoon*, only the death penalty, not the conviction was invalidated. Moreover, the jury in the instant case was not selected in the same manner as the *Witherspoon* jury. The Commonwealth anticipated what *Witherspoon* would allow as a proper form of voir dire. The district attorney was careful not to challenge a potential juror for cause if the juror merely stated that he had scruples against capital punishment. The district attorney always went on to ask whether the juror could in no case impose the death penalty. Only if the juror stated that he never could vote for a death penalty was he challenged for cause. *Witherspoon* indicates that if this procedure had there been followed, even the sentence of death would have been affirmed. Appellant has no legitimate complaint about the selection of the jury.

Another reason assigned for reversal is the failure of the court to conduct a formal voir dire of the minor witnesses in order to determine their competency to

testify.[1]  We stated in *Rosche v. McCoy*, 397 Pa. 615, 621, 156 A. 2d 307 (1959) : "Under 14 there must be judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity."  While we are of the opinion that the safest course would have been to conduct a formal voir dire, we fail to see how appellant was prejudiced by the procedure followed here.  The testimony of the witnesses revealed them to be competent, and if it had not, the trial judge could have ordered it stricken or, if the situation warranted it, ordered the withdrawal of a juror.

The most serious attacks leveled upon the proceedings below relate to the admission of evidence—slides showing the deceased's body, a photograph of appellant, Wright, and McSwain, and the testimony of Herbert Holliday.  The argument with regard to the slides is that they were so inflammatory as to prejudice appellant unduly.  The test that has evolved in these cases involving pictures of the victim's body is "whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors."  *Commonwealth v. Eckhart*, 430 Pa. 311, 242 A. 2d 271 (1968) ; *Commonwealth v. Powell*, 428 Pa. 275, 278, 241 A. 2d 119 (1968).  In both of the cited cases, admission of the photographs involved was held to constitute reversible error.  However, *Powell* was a clear case of felony-murder where the force used and the nature and extent of the injuries was irrelevant.  In the instant case, the Commonwealth, although advancing the felony-murder theory, also contended that this

---

[1] No request was made by appellant's counsel for a formal voir dire. This was understandable, as the minor witness, Emma Holliday, whose testimony was harmful to appellant, had already been permitted to testify in a previous jury trial of a co-defendant.

was a case of first degree murder by virtue of the use of a deadly weapon upon a vital part of the body.

Although the photograph in *Eckhart* also had some relevance, it was excluded after balancing its evidentiary value against its likelihood of inflaming the jury. In *Eckhart* "the gruesome scalp and bloody web of tangled hair" were found to be highly inflammatory and easily excisable. Stated simply, the slides in the instant case are not nearly so gruesome and inflammatory as were the photographs in *Eckhart*. This court has always recognized that the admission of photographs is within the discretion of the trial judge. *Eckhart,* supra; *Powell,* supra, and cases cited therein. The court below clearly exercised that discretion, taking care to limit any prejudicial effect the slides might have had. Although the Commonwealth sought to introduce five slides, the court admitted only three, excluding one as being repetitious, and a second as being too inflammatory. The three slides admitted were shown for a total of less than two minutes and did not go out with the jury. In view of all these circumstances, we cannot say that the admission of the three slides constituted an abuse of discretion.

Appellant further complains that he was prejudiced by the admission into evidence of a photograph showing appellant, Wright, and McSwain together.[2] Although not properly qualified to be directly relevant to the question of whether the three were together on the night of the slaying, it was surely relevant as circumstantial evidence—tending to prove that the three were often companions. In addition, the photograph was relevant for the purpose of showing that appellant had changed his hair style from a pompadour to a

---

[2] The photograph was not objected to at trial and ordinarily this would foreclose any consideration of it on appeal. However, in view of the allegation of inadequate representation by counsel, we will treat the argument on the merits.

close-cropped cut between the date of the slaying and the date of trial. Cynthia Jackson had described one of the two assailants as a dark-skinned Negro young man who wore his hair "high". The admission of this photograph was proper.

Finally, appellant urges that the court erred in permitting Herbert Holliday to testify as to what his daughter, Emma Holliday, told him after she witnessed the slaying. He further contends that the error in allowing Mr. Holliday to testify was compounded by the fact that the Commonwealth, after pleading surprise, was permitted to examine him as if on cross-examination. We find no error in either the content or the manner of his testimony. His was proper rehabilitation testimony for two distinct reasons. First his testimony tended to rebut the suggestion raised by appellant's counsel in his cross-examination of Emma Holliday that her story was recently fabricated. During the cross-examination of Emma, it was brought out that the police were not notified of the event allegedly witnessed until the following day. This could well have raised a doubt as to whether Emma really witnessed the event or whether she made up the story later. Herbert's testimony to the effect that Emma did relate the facts of the slaying immediately after it occurred, and that he told her to forget it, negates the inference of recent fabrication.

Moreover, prior consonant statements are proper rehabilitations when a witness has been impeached by the use of prior inconsistent statements. *Lyke v. Lehigh Val. R. R. Co.*, 236 Pa. 38, 84 Atl. 595 (1912). Emma Holliday had indeed been impeached by the use of prior inconsistent statements, not only as to number of assailants but as to identity. We cannot accept appellant's contention that it was error not to exclude this rehabilitation as being collateral to the main issues of the case. If examination as to the number of

assailants was improper rehabilitation, it was improper cross-examination too. Controlling the scope of the examination is a matter within the discretion of the trial judge, and permitting the instant testimony was a valid exercise of that discretion.

So too was permitting the Commonwealth to cross-examine the witness, Herbert Holliday, after pleading surprise. We see no reason why a rehabilitating witness should be treated any differently from any other regarding cross-examination after a plea of surprise. Providing that the surprise is shown to the satisfaction of the trial judge, such cross-examination is proper.

The judgment of sentence is affirmed.

Mr. Chief Justice BELL concurs in the result.