Commonwealth *v.* Sullivan, Appellant.

420

Submitted November 26, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused February 22, 1972.

*A. Charles Peruto,* for appellant.

*J. Bruce McKissock* and *Carl B. Feldbaum,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, December 29, 1971:

Judgment of sentence is affirmed by an evenly divided Court.

Mr. Chief Justice BELL and Mr. Justice EAGEN would reverse the judgment and discharge the appellant for the reason that there is insufficient evidence to support the conviction.

Mr. Justice COHEN took no part in the decision of this case.

---

OPINION IN SUPPORT OF ORDER BY MR. JUSTICE POMEROY:

Defendant-appellant Sullivan was convicted of first degree murder and sentenced by the Philadelphia Common Pleas Court, Criminal Division, to life imprisonment for the slaying of two persons, John Gorey and Rita Janda. The case is before this Court by way of appeal from the denial of motions in arrest of judgment and for a new trial.[1]

---

[1] The brief of the Commonwealth herein, for some unexplained reason, was not filed until seven months after the case had been

We adopt the lower court's statement of the facts as an accurate and adequate summary as follows:

"John Gorey, a union official of Teamster's Union, Local 107, and his girl friend, Rita Janda, were the victims of an assassination-type homicide carried out in Gorey's office on the second floor of the local's union hall and office building in Philadelphia, Pennsylvania, on the evening of June 17, 1966. Two firearms were used in killing each of the victims, and shots from both weapons were found in each of the bodies. The weapons were never found. No felony other than the homicides was involved, and there were no witnesses to the killing, so that the Commonwealth's case was basically presented and predicated upon circumstantial evidence.

". . . All of the circumstances considered by the jury and described by the witnesses covered a short period, roughly between 5:55 p.m. and 7:13 p.m., on the evening of the killing. The defendant offered no evidence, so that the testimony presented by the Commonwealth was submitted to the jury without contradiction.

"The Commonwealth's principal witness, Francis McGrath, a member of the local, had been employed by the union as janitor in the building involved at the time of the homicides, and had held official positions in the union in the past. McGrath testified that he arrived on the premises at about 5:55 p.m., at which time the building's parking lot was vacant except for two automobiles; the defendant's and that of another member of the union, Gregory Carchidi, who was also employed by the local as a janitor. The defendant, Sullivan, an official of Local 107, was then sitting at a desk beside a window in the second story office of another union official. From the window Sullivan had a view

submitted. Thereafter the appellant, in propria persona, filed a supplemental brief. (His original brief was filed by court-appointed counsel.)

of the parking lot, and his position at the window was maintained while McGrath entered the building, went up to that office on the second floor and began his janitorial work there. The switchboard for the telephone lines had been arranged for the night so that the line listed and used for incoming calls having to do with regular union business was plugged in to ring the extension telephone in the room where Sullivan was sitting. Another line with a different call number had been set up by the switchboard operator to ring in Gorey's room, by prearrangement with Gorey's knowledge, so that Joseph Vernick, who wished to speak with Gorey, could reach him by calling that number after 7 p.m. that evening. As McGrath started his cleaning work, Sullivan asked him why he was cleaning the building on this night, which was a Friday, and suggested that he wait until Sunday night to do the cleaning, pointing out that a union meeting was scheduled for Sunday during the daytime, so that the place would require cleaning after that meeting. The victims, Gorey and Janda, arrived between 6:10 and 6:15 p.m., and went to Gorey's office on the second floor. The witness continued emptying trash baskets and working his way from one room to the next around the second story, going from the office in which Sullivan was sitting to the conference room which was next, but for an areaway, to the office in which the victims then were.

"While McGrath was in the conference room the following things happened: John Gorey came in and had a conversation (which is not relevant), and left. 'In a matter of seconds, a half a minute' after Gorey left the conference room, Sullivan entered and said again, 'Why don't you let it go until after the meeting', speaking of the cleaning work that McGrath was doing. There followed a conversation with Sullivan about something that John Gorey had said, during which

Carchidi came into the conference room at a time estimated to be a matter of a minute or two after Sullivan had made his entrance.

"Upon Carchidi's entrance no greetings were exchanged between him and Sullivan. In fact, neither of them made any comment to the other. Instead, Carchidi spoke directly to McGrath, stating in Sullivan's presence just about what Sullivan had just said: '. . . leave the cleaning go until Sunday after the meeting.' Sullivan then left the conference room. McGrath testified that Sullivan's departure was 'from three to five minutes, approximately', after Gorey had left; that he then continued his cleaning, and that Carchidi 'reminded me again to let the cleaning go until after Sunday.' It was at this point that McGrath heard 'what I believed to be firecrackers . . . I heard a lot of noise, loud reports, which I thought were firecrackers . . . just like I said, Your Honor, it was a bunch of noises simultaneously. Don't know how to say the word, but if you light a whole pack of firecrackers and throw them on the floor and they would go off one right after another.' In this charged atmosphere McGrath turned to Carchidi who was seated in the chair behind him and exclaimed, 'What was that?' Whereupon Carchidi stated, 'Get out of the building and don't say nothing'. McGrath got out of the building and noticed that the cars that had been on the parking lot previously, Gorey's, Sullivan's and Carchidi's, were still there, but at this time there was another car also on the lot. McGrath fixed the time of his departure as between 7:05 and 7:15 p.m. He testified that, because of his hasty departure, doors to the rooms on the second floor where he had been working had been left open and the lights were left on when he left the building. He returned 15 to 20 minutes later and observed that the automobiles

of Sullivan and Carchidi, and the third car, had vacated the parking lot, leaving only the automobile of John Gorey; in addition, all of the doors inside the building had been closed, and all of the lights had been turned off. The door to the conference room which had been left open was now closed and locked.

"Other witnesses gave testimony which served to add important threads and details in the fabric of circumstantial evidence. For example, when Irene Glenn telephoned, dialing in on the principal telephone line of the union (which line, as previously noted had been set up to ring at the desk where Sullivan was then sitting), the call was answered by one who stated that he was Gorey. Her recollection was that this recipient of her call gave his name as 'Bill' Gorey; and, while she was not sure which first name he gave, she was quite positive that the last name given was 'Gorey'. It was uncontested that Sullivan had written her name and telephone number on a certain yellow sheet of paper which was found in the waste basket in that office. Coupled with this was the fact that her call was at 6:15 p.m., just shortly after the victims had arrived.

"Joseph Vernick, trying to reach Gorey, made his call to the number which was given to him by the union's telephone switchboard operator, Esther Snyder. She testified that she had plugged this line into Gorey's office with his knowledge, so that, presumably, he was expecting the call which remained unanswered that evening, apparently after his and Rita Janda's deaths. Vernick rang through on this line to Gorey's telephone several times, receiving no answer, over a period from 7:15 to 8:15 p.m."

We move now to a discussion of appellant's principal contentions of error in the dismissal of his post trial motions.

## I. Denial of Pre-Trial Rights

Four and one-half months after the killings, a Medical Examiner's Inquest was held to inquire into the circumstances surrounding the deaths of Gorey and Janda. Sullivan was subpoenaed and was present throughout, with counsel; he declined the opportunity to testify. The Medical Examiner determined that death was caused by gunshot wounds and that the manner of death was unlawful homicide. He held Sullivan, together with Carchidi and DiPasquale, without bail for the grand jury on the charge of murder and conspiracy. The three men were indicted for murder, and motions to quash the indictments were denied. They were tried separately, and this appeal concerns Sullivan's case only.[2]

A. Sullivan claims that the initiation of this case by the vehicle of the Medical Examiner's hearing was contrary to Rules 102 and 116 of the Pennsylvania Rules of Criminal Procedure as they existed at the time of the initiation of this proceeding. Rule 102 declared that "except as otherwise provided in these rules, all proceedings shall be initiated by a written complaint, sworn to or affirmed, and subscribed by an affiant." Rule 116 mandated that an accused receive a preliminary arraignment and a preliminary hearing.[3]

In 1967, in *Commonwealth v. Lopinson,* 427 Pa. 284, 234 A. 2d 552 (1967), this Court decided that the holding over of an accused for grand jury proceedings by the

---

[2] DiPasquale was acquitted when the Commonwealth could not produce its main witness. *Commonwealth v. DiPasquale,* 431 Pa. 536, 246 A. 2d 430 (1968). According to the briefs of the parties in the present case, Carchidi was also acquitted.

[3] Both Rule 102 and Rule 116 in issue here were adopted on June 30, 1964, and became effective on January 1, 1965. Both have been replaced by Rules of the same number which were adopted on January 31, 1970, and became effective on May 1, 1970.

Philadelphia Medical Examiner without the usual procedure of a preliminary hearing before a magistrate or justice of the peace did not render void the subsequent judgments. Although the *Lopinson* case grew out of incidents occurring before the adoption of the version of Rules 102 and 116 which are in issue here, the reasoning of that case is controlling. As the opinion of Mr. Justice EAGEN stated, "The Philadelphia medical examiner possesses all of the powers of a coroner by virtue of the provisions of the Philadelphia Home Rule Charter, including jurisdiction to conduct an inquest when sudden, violent or unnatural deaths occur, and to act as a committing magistrate if the deaths are found to be the result of homicide." The opinion then quoted with approval the lower court's historical recital in support of this holding. 427 Pa. at 291.

The functions of the office of the coroner in relation to our Rules 102 and 116 were fully considered in the case of *Commonwealth v. Guy,* 41 Pa. D. & C. 2d 151 (Ally. Cty. 1966). In that case Common Pleas Judge ALDISERT (now of the United States Court of Appeals for the Third Circuit) in a learned historical opinion, concluded that the coroner's investigation was a proper alternative to the directives of Rules 102 and 116 for the initiation of criminal proceedings. Judge ALDISERT demonstrated that since its inception in 1276, the office of coroner has been investigative in nature, as well as judicial; it is an office designed to protect the public welfare, and, for this purpose, includes the powers of a committing magistrate. Further, Judge ALDISERT noted that to require a coroner's hearing to begin with the filing of a written complaint, as appellant contends is required by Rule 102, would defeat the inherent quasi-investigative powers of that office, and hence the purpose of the office itself. Unlike a justice of the peace or other committing magistrate, the coro-

ner has the power and the duty to determine, upon an investigation undertaken on his own motion of the facts surrounding a suspicious death, that there is sufficient cause to hold an accused for the unlawful killing of another human being. The justice of the peace or ordinary committing magistrate, including a judge of the court of common pleas, has no power in his own right to set in motion the formal criminal process; he must await a written complaint of either a peace officer or an ordinary citizen. *Commonwealth v. Guy, supra,* at 165-66.

Based on the historical reasoning concerning the office of coroner contained in *Lopinson* and *Guy,* supra, we hold that Rules 102 and 116 of the Pennsylvania Rules of Criminal Procedure apply only to the initiation of criminal proceedings before a justice of the peace or other committing magistrate who lacks both the power and the duty to conduct the initial investigation and to ferret out crimes. To do otherwise would mean the abolition of the total function of the office of the coroner; the Rules of Criminal Procedure do not intend a result so drastic. *Commonwealth v. Rose,* 437 Pa. 30, 261 A. 2d 586 (1970), relied on by appellant, does not dictate otherwise. The *Rose* case concerned not the duties and functions of the office of coroner but the question whether a common pleas judge sitting as a committing magistrate could initiate proceedings for perjury without the filing of a complaint or granting a preliminary hearing. As we have recently indicated in *Commonwealth v. McCloskey,* 443 Pa. 117, 277 A. 2d 764 (1971), the broad language of the opinion in *Rose* with respect to Rules 102 and 116 must be read as applicable to the facts of that case. The *Rose* decision was no more intended to abolish the coroner's inquest or the medical examiner's hearing

than it was to do away with the investigating grand jury.

B.   Sullivan also claims he was denied his pre-trial rights when the trial court failed to grant his motion to quash the indictments. This motion raised, inter alia, the alleged violation of Sullivan's rights to challenge the array of the grand jury by the procedure set forth in Rule 203 of the Pennsylvania Rules of Criminal Procedure. Rule 203 requires that the challenge to the array be made before the grand jurors are sworn and in any event before the bill of indictment is submitted to the grand jury.[4] This procedure was not followed in the instant case. Sullivan was held without bail at the conclusion of the Medical Examiner's inquest into the death of Rita Janda and John Gorey and was indicted eleven days thereafter. No challenge to the array was made during this eleven-day period. The question of the denial of Sullivan's right to challenge the array was first raised more than two months after the indictments were handed down when Sullivan's new counsel, shortly after his retention by Sullivan, moved to quash the indictments.

It is argued that this untimeliness should be overlooked because the accused was not given notice of the grand jury to which his case was to be submitted; all that he was told by the medical examiner was that he was being held "for action of court". He thus seeks to assimilate this case to *Commonwealth v. Dessus*, 423 Pa. 177, 224 A. 2d 188 (1966), and *Commonwealth v. Collemacine*, 429 Pa. 24, 239 A. 2d 296 (1968), where we held on the facts there involved that the accuseds' right of challenge to the array had been taken from them by the Commonwealth. The facts of those cases

---

[4] As amended effective June 1, 1967, Rule 203 provides a minimum challenge period of ten days.

are far different, and neither is controlling. In the one case the presentment of the bill of indictment to the grand jury occurred on the very day the accused was held over by the committing magistrate; in the other the accused was told he was being held for an August grand jury when in fact his case was presented, without any notification to him, to a later (October) grand jury. In the present case, in contrast, Sullivan, while still represented by counsel, became an accused and was held "for action of court" with respect to the homicides of Gorey and Janda. The precise date of the intended presentation was readily ascertainable, if indeed not already known to counsel, and eleven days was ample time in which to challenge the array.

## II. EXCLUSION OF JURORS

Appellant claims the trial court erred by permitting the Commonwealth to challenge for cause any prospective juror who exhibited scruples against capital punishment. This, he argues, was error for two reasons: first, that to eliminate persons who have conscientious scruples against the death penalty is to deprive appellant of a jury of his peers representing a cross-section of the community; and second, that to eliminate such persons assures the Commonwealth "of a jury composed exclusively of a sanguine and prejudiced nature". The appellant further asserts in his brief that "one who is so sanguine and cold-hearted as to have no scruples against a death penalty . . . is more apt to find a defendant guilty."

Neither the Federal Constitution, applicable to the states through the Fourteenth Amendment, nor the Constitution of Pennsylvania supports appellant's contention that exclusion of those jurors with scruples against the death penalty amounts to reversible error as violative of the right of trial by jury. In *Wither-*

*spoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776 (1968), the United States Supreme Court held that the exclusion of persons with conscientious scruples against infliction of capital punishment was reversible error in a case in which the defendant was sentenced to death (only the sentence was reversed, not the conviction). On the same day as *Witherspoon,* in *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797 (1968), the Court held that it was not reversible error to exclude prospective jurors who had conscientious scruples against capital punishment when the jury returned a guilty verdict with a recommendation of life imprisonment. The holdings of *Witherspoon* and *Bumper* are the law in Pennsylvania. *Commonwealth v. Ingram,* 440 Pa. 239, 248, 270 A. 2d 190 (1970); *Commonwealth v. Rightnour,* 435 Pa. 104, 253 A. 2d 644 (1969); *Commonwealth v. Servey,* 434 Pa. 433, 256 A. 2d 469 (1969); *Commonwealth v. Wilson,* 431 Pa. 21, 244 A. 2d 734 (1968). Sullivan was sentenced to life in prison, not to death, and the cited cases control.

With regard to Sullivan's second argument, that a jury selected by removing those with scruples against inflicting capital punishment is more "prosecution prone" and thus more likely to return a verdict of guilty than a jury not so chosen, we note that the same argument was dismissed by the United States Supreme Court as being unsupported by present scientific fact. *Witherspooon v. Illinois, supra,* 391 U.S. at 516; see also *Maxwell v. Bishop,* 398 U.S. 262, 26 L. Ed. 2d 221 (1970). Nothing stated by appellant has given us any reason to disagree with the United States Supreme Court on this point.

### III. ADMISSIBILITY OF COLOR SLIDES

In the course of the Commonwealth's case it offered and was allowed to introduce a number of photographic

color slides depicting the room in which the murders occurred and the dead bodies of the two victims as found therein. The Commonwealth offered the pictures to enable the jury to understand clearly the nature of the scene, the location of the bodies in the room, the nature of the wounds and injuries inflicted, the extent of the injuries, and in order to clarify the medical examiner's explanation of the sequence of the shots fired. It was the Commonwealth's theory, substantiated by ballistic evidence, that the murdered couple were killed by shots from two different weapons, and that each person was hit by shots from both guns. From the reconstruction of the shooting as it occurred through use of the slides the Commonwealth sought to demonstrate that neither victim could have shot the other; that Gorey was the primary target of the assassins, and that Mrs. Janda was then shot whilst seeking refuge under a desk.

The defense objected to the introduction of any pictures, the primary objections both at trial and on appeal being that they were not relevant and were highly prejudicial. The irrelevancy argument was based on (1) the statement of the Commonwealth's pathologist that the pictures did not differ from his report, and (2) the assertion that the pictures were unnecessary to show the specific intent aspect of first degree murder for the reason that the appellant admitted that the killing was brutal and premeditated and would warrant a finding of first degree murder against someone. The objections to about forty slides were overruled after a lengthy consideration and previewing by the trial judge out of the presence of the jury; as to another group the objections were sustained. The viewing time was limited to an average of approximately 30 seconds per slide; the pathologist witness for the Commonwealth described the slides as they were shown. There

is no doubt that the slides were somewhat repulsive, showing not only close-ups of the contorted bodies of the two deceased persons lying in pools of blood, but also close-ups of the bullet holes in the heads and other portions of the anatomies of the victims.

This Court has said frequently that the admissibility of slides or photographs exhibiting the body of the victim in a homicide case is within the discretion of the trial judge, and unless there is a flagrant abuse of this discretion there is no reversible error. *Commonwealth v. Chasten,* 443 Pa. 29, 275 A. 2d 305 (1971); *Commonwealth v. Wilson,* 431 Pa. 21, 244 A. 2d 734 (1968), *cert. denied,* 393 U.S. 1102, 21 L. Ed. 2d 794 (1969); *Commonwealth v. Powell,* 428 Pa. 275, 241 A. 2d 119 (1968); *Commonwealth v. Snyder,* 408 Pa. 253, 182 A. 2d 495 (1962); *Commonwealth v. Dickerson,* 406 Pa. 102, 176 A. 2d 421 (1962); *Commonwealth v. Boden,* 399 Pa. 298, 159 A. 2d 894 (1960); *Commonwealth v. Novak,* 395 Pa. 199, 150 A. 2d 102 (1959); and *Commonwealth v. Peyton,* 360 Pa. 441, 62 A. 2d 37 (1948). Further, we have stated "that the proper test to be applied by a trial court in determining the admissibility of photographs in homicide cases is whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Powell, supra,* 428 Pa. at 278-79. We are mindful, also, that "such exhibits are not to be excluded merely because they are horrid or gruesome. The picture of one in death, particularly if the death resulted from violent means, can never be expected to be an aesthetic or pleasant vision: see, Commonwealth v. Johnson, 402 Pa. 479, 167 A. 2d 511 (1961); Commonwealth v. Dickerson, 406 Pa. 102, 176 A. 2d 421 (1962)." *Commonwealth v. Snyder,* 408 Pa. 253, 257, 182 A. 2d 495 (1962). This law was not overlooked by

the lower court; in fact, it ordered a reargument of that part of the new trial motion involving this question in order to consider whether our decision in *Powell, supra,* was intended to propound a new rule as to admissibility of photographs in homicide cases, and concluded (one judge dissenting) that it was not. In this we think the court was correct. A similar contention was made and rejected in *Commonwealth v. Wilson, supra,* and *Commonwealth v. Robinson,* 433 Pa. 88, 93, 249 A. 2d 536 (1969). As was pointed out in *Wilson, Powell* was "a clear case of felony-murder where the force used and the nature and extent of the injuries was irrelevant." The slides in *Powell* went far beyond any possible relevance, including, for example, post autopsy demonstrations such as the peel-back of a scalp.

The question, then, is simply whether the trial judge committed "a flagrant abuse of discretion" in admitting the pictures. *Commonwealth v. Peyton, supra.* Having ourselves examined the pictures in the context of the rest of the evidence in the case, we are satisfied that he did not. The violent nature of the killings, indeed, the assassination-like aspects of it, was a vital part of the case and one as to which the jury was entitled to be fully informed. The slides were clearly of aid to the pathologist in giving his testimony as to the first degree character of the killings. Moreover, the conspiracy question, considered below in Part IV, was an issue in the case which added to the importance and significance of the nature of the wounds and positions of the bodies. It is clear to us that the admitted pictures in general supplemented in a meaningful way the pathological testimony and therefore had essential evidentiary value. While some of the pictures were gruesome, we cannot say that they were such as to inflame the minds and passions of the jury as to Sullivan, the defendant-appellant. Any tendency they may have had in

this direction was properly warned against by the trial judge before they were shown, as required by our decision in *Commonwealth v. Robinson, supra,* and again in the course of his charge.[5]

Finally, we hold that a defendant may not render evidence which is necessarily a part of the Commonwealth's case irrelevant and inadmissible merely by offering to stipulate. Specifically, photographs which would otherwise be of essential evidentiary value cannot be rendered inadmissible because of a stipulation

---

[5] The cautionary instructions of Judge BARBIERI prior to the showing were as follows:

"Ladies and gentlemen of the jury, you see this screen here. There will be some color slides used by a witness who will be testifying, and these are pictures that have to do with the two homicides in this case, and also with the scene of the homicides.

"Now, these pictures, as all pictures of scenes such as these, are somewhat unpleasant. They may have some aura of drama to them. This you are to disregard. You are to disregard any inflammatory influence that you may see or may feel that might otherwise come from these pictures, because these pictures are being presented solely for the purpose of helping to convey to you the information that they contain, and also add, if possible, to the accuracy of the circumstances and the details that are depicted. Usually, pictures are of greater accuracy than words. And, for that reason, they are presented to you. But, I must caution you that you should keep your minds clear of any emotional feeling that might arise from seeing such unpleasant scenes, because your mission, of course, is to decide the facts and issues in this case dispassionately and without any feeling of emotion."

The further cautionary instruction as contained in the charge was as follows:

"I want to say at this point that those photographs were offered to bring to your attention whatever evidentiary value that they could add to the testimony. They are not intended to bring to you the feeling of horror or any emotional reaction whatsoever The importance of them and why we allow them to be shown is simply that they depict something important. Important from the point of view of first degree murder, to see how these people were killed. A stray shot that could kill somebody is very different from a body that is riddled with bullets in the vital parts."

(by one who does not admit to the crime) that the murderers had specific intent and premeditation. The Commonwealth, with its burden of establishing guilt beyond a reasonable doubt, may not be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce. *Commonwealth v. Bonomo*, 396 Pa. 222, 151 A. 2d 441 (1959); *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A. 2d 426 (1968); see also, *State v. Jensen*, 209 Ore. 239, 296 P. 2d 618 (1956); *appeal dismissed*, 352 U.S. 948, 1 L. Ed. 2d 241.

### IV. ADMISSION OF HEARSAY AND OTHER EVIDENCE

Appellant contends that it was error to admit into evidence a statement purported to have been made by Carchidi, one of the alleged co-conspirators of Sullivan, to McGrath. In addition, appellant asserts that it was error to admit into evidence testimony concerning the conduct of DiPasquale, the other alleged co-conspirator.

The statements attributed by the witness McGrath to Carchidi was that, upon hearing the firecracker-like noises, Carchidi exclaimed to McGrath, "Get out of the building and don't say nothing." It is asserted that this was inadmissible hearsay. We agree that it was hearsay because it was offered to establish an inference as to Carchidi's state of mind, i.e., that Carchidi recognized the firecracker-like sounds to be the discharging of the guns that killed Gorey and Janda.

The Commonwealth seeks to justify the admission of this statement under the doctrine that the statements were those of a co-conspirator made in the course of a still operating conspiracy. See *Commonwealth v. Wilson*, 394 Pa. 588, 148 A. 2d 234 (1959); *Commonwealth v. Spardute*, 278 Pa. 37, 49, 122 Atl. 161 (1923); *Commonwealth v. Biddle*, 200 Pa. 640, 645, 50 Atl. 262

(1901). The trial judge has considerable discretion in the order of proof and may receive evidence in the form of declarations of alleged co-conspirators on condition that other proof of the conspiracy follow. *Commonwealth v. Jermyn*, 101 Pa. Superior Ct. 455, 471 (1930).

We need not decide, however, whether there was a sufficient showing of a conspiracy to justify the admission of the challenged statement, for we think it was admissible under the spontaneous utterance or res gestae exception to the hearsay rule.[6] "A res gestae declaration may be defined as a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties." *Allen v. Mack*, 345 Pa. 407, at 410, 28 A. 2d 783 (1942). The rationale for admitting into evidence spontaneous utterances such as the one here in issue is that the spontaneity guarantees the truthfulness. *Commonwealth v. Edwards*, 431 Pa. 44, 244 A. 2d 683 (1968); *Commonwealth v. Cheeks*, 423 Pa. 67, 223 A. 2d 291 (1966). Hence the test of the admissibility is whether the declaration was spontaneous, excited, or impulsive or was the product of reflection and deliberation. If the former, it is admissible; if the latter, it is not. See Henry, *Pennsylvania Evidence*, §466, p. 464; McCormick, *Evidence*, §272, p. 580.

---

[6] Some modern text writers consider the spontaneous utterance exception and the res gestae exception to the hearsay rule as two different classifications. See, e.g., McCormick, *Evidence*, §§272-274, citing 6 Wigmore on Evidence, §§1745-1747.

440

The appellant nevertheless questions the probative value or relevancy of this statement or ejaculation by Carchidi. He states that even if the ejaculation tends to show that Carchidi knew that the noises were bullets, there is no connection between this fact and him, Sullivan. We disagree. It was established by other evidence that Sullivan was in the building at this time and that he had just left the room where Carchidi and McGrath were speaking at the time the explosive sounds rang out. We think that the testimony of Carchidi's statement to McGrath was at the least relevant, along with the other evidence relative to the time and circumstances of the shootings, to show that Sullivan was in the vicinity of the murders when they occurred.

The appellant also objected to the testimony of McGrath to the effect that he saw, both before and immediately after the murders, a car, known to him to have been driven by DiPasquale, parked in the parking lot of the union hall. McGrath's testimony was supported by the testimony of a garageman that several days before and several days after the day of the murders, DiPasquale had driven a car belonging to one John Rispo into his shop for repairs. Appellant asserts that there was insufficient evidence of conspiracy between DiPasquale, Carchidi and himself to justify the admission of this testimony. The trial judge ruled, and we think quite properly, that the fact that a particular car was parked in the lot during the crucial period in which the murders were committed was relevant and admissible to show the total circumstances surrounding the crime, and that this is so without regard to any theory of conspiracy.

V. The Sufficiency of the Evidence

Appellant earnestly argues, finally, that the evidence in this case was, as a matter of law, insufficient

to sustain the conviction of murder. It goes without saying that in reviewing the record to determine whether the verdict was justified, the Commonwealth, as the verdict winner, is entitled to all reasonable inferences which may be drawn from the facts proved, and to have all disputed facts resolved in its favor, *Commonwealth v. Cooney*, 431 Pa. 153, 244 A. 2d 651 (1968) ; also, that circumstantial evidence alone may be sufficient to prove guilt beyond a reasonable doubt. *Commonwealth v. Thomas*, 429 Pa. 227, 239 A. 2d 354 (1968).

The evidence is set forth in considerable detail at the beginning of this opinion, and need not be repeated. Restated in capsule form (the typewritten transcript of testimony is 1346 pages in length), the salient points of the Commonwealth's case were the following: Five persons, and possibly six, were in the union hall at the time of the killings. When McGrath arrived to clean the hall at 6:00 p.m., that Friday evening he found that cars belonging to Sullivan and Carchidi were in the parking lot, as was a car which he recognized to be one which often was driven by DiPasquale. Upon his entrance into the building, McGrath found Sullivan and Carchidi to be there. A few minutes later he saw, from a window, John Gorey and Rita Janda, the victims, arrive in Gorey's automobile. As McGrath began to clean the hall, both Sullivan and Carchidi sought to have him discontinue his janitorial work and to leave the building. Shortly thereafter, while McGrath and Carchidi were talking, the "firecracker-like sounds" rang out. McGrath exclaimed "What's that?", and Carchidi responded, "Get out of the building and don't say nothing." McGrath left the building promptly, noting that the same cars (with the addition of Gorey's) were parked in the lot as when he had entered the building. He also noticed DiPasquale standing outside the hall. McGrath got into his car and drove home. Returning to

the scene a short time later, McGrath observed that only Gorey's car remained in the lot. Except for the bodies of the victims, the building was empty.

Autopsies of the bodies of Gorey and Janda showed that they had died from the result of gunshot wounds, which, according to the pathologist, could have occurred at the time that McGrath heard the "firecrackers".

Mrs. Irene Glenn testified that she telephoned the union hall between 6:15 and 6:30 that evening and left a message with one identifying himself as "Bill Gorey". Police investigators later found a scrap of paper in the wastebasket which contained Mrs. Glenn's name and telephone number, as well as the signature of "John J. Sullivan", repeated several times. A handwriting expert positively identified this writing as that of Sullivan.

In our opinion, this evidence, albeit circumstantial, was clearly sufficient, if believed, to permit the jury to convict appellant of the murders of John Gorey and Rita Janda. No error was committed in refusing the motion in arrest of judgment.

Mr. Justice JONES and Mr. Justice O'BRIEN join.

———

OPINION BY MR. JUSTICE ROBERTS IN SUPPORT OF REVERSAL OF THE ORDER:

I dissent because the Commonwealth, on this record, has failed to show any connection between the appellant and the murders charged. The opinion in support of the order sustains a conviction of first degree murder and a sentence of life imprisonment. It does so on the circumstantial evidence that appellant Sullivan, was one of five or six people in the building at the time of the killing, that a few minutes before the killing appellant had asked a janitor to leave a conference until after a "meeting" and finally that appellant had misstated his identity to a telephone caller shortly before

the killings. This evidence in my judgment is completely insufficient to support a conviction and I would grant the motion in arrest of judgment and order the defendant discharged.

It is well established that "where a conviction is based entirely on circumstantial evidence, 'the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all'." *Commonwealth v. Simpson,* 436 Pa. 459, 464, 260 A. 2d 751, 754 (1970); *Commonwealth v. Clinton,* 391 Pa. 212, 218, 137 A. 2d 463, 466 (1958). Furthermore, ". . . in a prosecution based upon circumstantial evidence, conviction may not be based upon *suspicion or conjecture,* but rather the evidence must be such as " 'reasonably and naturally to justify any inference of the guilt of the accused . . . and of such volume and quality as to overcome the presumption of innocence. . . .' Id. [Commonwealth v. Clinton, 391 Pa.] at 218-19, 137 A. 2d at 466." *Commonwealth v. Townsend,* 428 Pa. 281, 286, 237 A. 2d 192, 195 (1968) (emphasis added).

The evidence against appellant at most reaches only to the level of "suspicion or conjecture." At the time of the killings, five or six persons were in the union hall, one of whom may have been appellant. A janitor, McGrath, arrived at the union hall at 6:00 p.m. and saw two cars belonging to appellant and one Carchidi in the parking lot. McGrath encountered Sullivan and Carchidi in the building. When McGrath began his cleaning work, Sullivan asked him why he was cleaning the building that night, suggesting that he wait until Sunday. The janitor continued and was cleaning the conference room when appellant again asked McGrath to stop work "until after the meeting". Appellant then left the conference room. Shortly thereafter, McGrath heard sounds like "firecrackers". McGrath immediately left the building seeing appellant's car still

parked in the lot. When he returned 15 to 20 minutes later, appellant's car was gone. Finally, a Mrs. Irene Glenn testified that she called the union hall between 6 :15 p.m. and 6 :30 p.m., leaving a message with a person who identified himself as "Bill Gorey". A scrap of paper was found in a nearby waste basket containing Mrs. Glenn's number and Sullivan's signature. The writing was identified as that of Sullivan.

The opinion in support of the conviction recites the above evidence and simply concludes that it is sufficient to sustain a conviction of murder in the first degree. I cannot agree. The Commonwealth has merely established that appellant may have been in the building when the killings occurred. He was only seen a short while before the homicides occurred. Furthermore, appellant's car was no longer in the parking lot when McGrath returned at 7 :20 p.m. and the building was empty. These circumstances demonstrate only that appellant was *one of five or six possible suspects*. Carchidi, who, like appellant had been in the building shortly before the killings, was acquitted. Yet, it was Carchidi, shortly after McGrath heard the "firecrackers" who told McGrath to "Get out of the building and don't say nothing".

Aside from the insufficiency of the evidence, the result reached by the opinion in support of the order suffers from another fatal defect. On this record, it was clear and prejudicial error for the trial court to admit over objection evidence of forty color slides. The opinion in the support of the order describes the pictures as "repulsive, showing not only close-ups of the contorted bodies of the two deceased persons lying in pools of blood, but also close-ups of the bullet holes in the heads and other portions of the anatomies of the victims." Each of the gruesome color slides of the murder victims was shown to the jury for approximate-

ly 30 seconds. Even under the theory of the opinion in support of the order it is submitted that appellant is entitled to a new trial.

The slides were shown to the jury ostensibly for the purpose of clarifying the testimony of the medical examiner who described the wounds and the positions of the bodies at the time the shots were fired, although appellant did not question the nature or cause of the deaths. Indeed, the medical examiner, when asked whether his testimony accurately reflected what the slides portrayed, replied: "To the best of my descriptive ability, it does"; furthermore, when asked if there was anything questionable about "his findings" which the photographs might clarify, he replied "I would say no". This testimony shows that there was simply no need for the slides. There is nothing in the record to support the Commonwealth's contention "that the slide[s] were necessary to the jury's understanding of the medical examiner's testimony. . . ." *Commonwealth v. Collins,* 440 Pa. 368, 371, 269 A. 2d 882, 884 (1970).

In *Commonwealth v. Powell,* 428 Pa. 275, 241 A. 2d 119 (1968), this Court held that the proper test for admissibility of this type of photographic evidence "is whether or not the photographs are of *such essential evidentiary value* that their need *clearly outweighs the likelihood* of inflaming the minds and passions of the jurors." Id. at 278-79, 241 A. 2d at 121; accord *Commonwealth v. Wilson,* 431 Pa. 21, 31, 244 A. 2d 734, 740 (1968), cert. denied, 393 U.S. 1102, 89 S. Ct. 901 (1969); *Commonwealth v. Eckhart,* 430 Pa. 311, 317, 242 A. 2d 271, 274 (1968).

It is evident to me that the slides, gruesome and horrid to look at and shown to the jury for about twenty minutes, were not of "such essential evidentiary value" as to "clearly outweigh the likelihood of inflaming" the jurors. The Commonwealth's case rested en-

tirely on at best questionably sufficient circumstantial evidence. Such deficiencies in proof should not be overcome by the admission of prejudicial and inflammatory slides.

Accordingly, I would grant the motion in arrest of judgment and order the defendant discharged.