**UNITED STATES of America ex rel. Santos NAVARRO**

v.

**Robert L. JOHNSON, Supt.**

**Civ. A. No. 72-206.**

United States District Court, E. D. Pennsylvania.

Oct. 4, 1973.

As Amended Oct. 26, 1973.

Stanford Shmukler, Philadelphia, Pa., for petitioner.

Judith Dean, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is a habeas corpus matter. Petitioner, Santos Navarro, is currently serving two sentences totalling three and one-half to ten years imposed by Judge Edmund B. Spaeth, Jr. of the Court of Common Pleas of Philadelphia County following a non-jury trial in which petitioner was found guilty of aggravated assault and battery upon Juan Ocasio and Joseph Pacheco.[1] Judge Spaeth credited the Commonwealth's evidence that petitioner had attacked his victims with a knife and rejected petitioner's testimony that he had acted in self-defense.

In its current posture the case presents one principal issue on the merits: whether petitioner was deprived of the effective assistance of counsel at his trial. However, we are also confronted with difficult threshold issues of exhaustion of state remedies and deliberate by-pass which we will address after outlining the complex post-trial procedural history.

### II. *The Post-Trial Procedural History*

Petitioner was tried, convicted and sentenced by Judge Spaeth on August 17, 1966. He is a Puerto Rican American who speaks but little English now and who spoke virtually none at the time of the trial. Consequently he testified through an interpreter as did Ocasio and Pacheco, the victims of the crime. Petitioner filed no direct appeal. However, on February 11, 1967, he filed a petition under the Pennsylvania Post Conviction Hearing Act (PCHA), 19 P.S. § 1180–1 et seq., alleging that he had been deprived of the effective assistance of counsel at trial because of the inadequate preparation and trial performance of his counsel, Michael E. Quinlan, Esq., then an attorney with the Philadelphia Defender Association. He further alleged that Mr. Quinlan had not advised him of his right to appeal. P. J. Di-Quinzio, Esq. was appointed to represent petitioner in the PCHA proceedings. On April 24, 1967, an evidentiary hearing was held before Judge Stanley M. Greenberg. At the conclusion of the hearing Judge Greenberg made a finding that petitioner received the effective assistance of counsel at his trial, although he did not make that the basis of relief. Because Judge Greenberg found that petitioner had not been advised of his right to appeal, he granted him the right to appeal *nunc pro tunc*, noting that one of the issues that could be raised by way of post-trial motions before Judge Spaeth was the question of the ineffectiveness of trial counsel.

Pursuant to Judge Greenberg's order, post-trial motions were filed and heard before Judge Spaeth. In those motions petitioner, through his counsel, Mr. Di-Quinzio, alleged that Mr. Quinlan had not adequately presented to Judge Spaeth certain alleged conflicts in the testimony of the two prosecution witnesses; that these alleged conflicts were never considered by the judge; that Mr. Quinlan was denied the right of summation; that Mr. Quinlan's cross-examination of Robert Pacheco was unduly restricted; and that Judge Spaeth was aware of petitioner's criminal record prior to determining his guilt. On August 2, 1967, Judge Spaeth filed an opin-

---

1. On Bill # 5583 (Juan Ocasio), the sentence was three to seven years. On Bill # 5584 (Joseph Pacheco), petitioner was found guilty by Judge Spaeth of assault and battery with intent to murder and was sentenced initially to a consecutive three to seven-year term. However, Judge Spaeth subsequently arrested the judgment as to that count, reduced it to aggravated assault and battery, and resentenced petitioner to a term of six months to three years to run consecutively with the other sentence. In point of fact, nearly the first four years which petitioner served following the conviction represented back time on a previous conviction. Judge Spaeth's sentence did not become effective until June 24, 1970. The minimum term on his present sentence expires on December 24, 1973 and his maximum expires on June 24, 1980.

ion and order denying the post-trial motions except as noted above (see note 1).

Petitioner, again assisted by Mr. DiQuinzio, appealed to the Pennsylvania Superior Court, alleging as grounds for relief: (1) that trial counsel was denied the right of summation; (2) that he was denied the effective assistance of counsel since Mr. Quinlan failed to request the right of summation; (3) that his failure to object to the lack of opportunity for summation did not constitute a waiver of that right; (4) that the evidence was insufficient; and (5) that Mr. Quinlan's right of cross-examination of Robert Pacheco was unduly restricted. On May 10, 1968 the Superior Court affirmed the judgment of sentence in a *per curiam* order. Commonwealth v. Navarro, 212 Pa.Super. 727, 241 A.2d 348 (1968). Mr. DiQuinzio then filed in the Pennsylvania Supreme Court a petition for allowance of appeal from the judgment of the Superior Court, alleging as grounds for relief the first three of the grounds set forth in the Superior Court appeal. On December 26, 1968, the Pennsylvania Supreme Court denied the allocatur petition as of No. 231–A No. 16 Miscellaneous Docket.

Petitioner next filed a petition for writ of habeas corpus in this Court, which was assigned to the docket of Judge C. William Kraft, Jr. (Miscellaneous No. 69–111). The habeas petition relied upon the same grounds for relief as were put forward in the state Supreme Court petition for appeal, i. e., denial of the right of summation, that counsel was ineffective for failing to request the right of summation, and that counsel's failure to object to the lack of opportunity for summation did not constitute a waiver of that right. In addition, petitioner alleged that the trial court lacked jurisdiction to hear the case since petitioner did not recall signing a waiver of jury trial, a ground for relief not previously asserted in his state court appeals. On May 19, 1969, Judge Kraft filed an opinion and order denying the petition for habeas corpus, holding that: (a) trial counsel was not denied the

right of summation since no request therefor was made; in addition, because of the brevity of the trial (the transcript totals but 34 pages), there was no need for a summation; (b) petitioner was effectively represented by counsel; and (c) available state remedies had not been exhausted as to the question of waiver of jury trial. On August 13, 1969, the Court of Appeals denied petitioner's application for certificate of probable cause as of C.A.Misc. Record No. 1263.

Petitioner thereupon returned to the state courts, where, on May 27, 1970, he filed a second PCHA petition, alleging that he was denied his Sixth Amendment right of confrontation because two alleged eyewitnesses were not called by the Commonwealth. Petitioner contended that he had not raised those issues previously because he was of Spanish descent and had very little knowledge of the English language, and was ignorant of his legal rights. The Commonwealth filed a timely answer, and on June 26, 1970, Judge Spaeth dismissed the petition without a hearing or appointing counsel.

On August 27, 1970, relator filed a third PCHA petition alleging that Judge Spaeth had improperly dismissed the May 27, 1970, petition without appointing counsel or allowing an amendment. On December 10, 1970, Judge Spaeth dismissed that petition without a hearing or appointing counsel. An Appeal from that order was filed in the Superior Court of Pennsylvania as of No. 314, October Term 1971. On February 5, 1971, Judge Spaeth filed a memorandum in support of his Orders dismissing the second and third PCHA petitions. He noted that he had dismissed the second petition because petitioner had waived his right to assert that error by not raising the error at the first Post-Conviction Hearing or in his subsequent motions for arrest of judgment and for a new trial. Furthermore, petitioner had not alleged "extraordinary circumstances" excusing the failure to raise that issue. Judge Spaeth rejected peti-

tioner's contention that he required the assistance of counsel because of his difficulties with the English language, noting that an interpreter had been available to petitioner and counsel throughout the trial and throughout the hearing on the first petition. The judge rejected petitioner's request to amend the second petition, on the grounds that there was no factual averment explaining failure to raise an issue at the earlier hearing. He also concluded that petitioner's unfamiliarity with English did not preclude waiver.

The Philadelphia Defender Association was appointed to represent petitioner on appeal. In that appeal, petitioner alleged that Judge Spaeth had improperly dismissed the second and third post-conviction petitions, and that he had erred in ruling that petitioner waived his right to assert the substantive claim raised for the first time in the second post-conviction petition because of his failure to raise that issue in his first post-conviction petition and in his appeal *nunc pro tunc*. The Commonwealth argued that the post-conviction petitions had been properly dismissed because the substantive claim raised in the second petition was patently frivolous. On August 12, 1971, the Superior Court affirmed the order of Judge Spaeth, *per curiam,* and without opinion. Commonwealth v. Navarro, 219 Pa.Super. 731, 280 A.2d 447 (1971). On December 15, 1971, the Supreme Court of Pennsylvania denied a petition for allowance of appeal, as of No. 263 Allocatur Docket.

Petitioner next returned to the federal courts by filing the present habeas corpus petition. In that petition, he alleged that: (1) the state courts improperly dismissed his second and third post-conviction petitions without appointing counsel; (2) the state courts had erred in ruling, without a hearing, that he had waived his right to assert the constitutional issue raised for the first time in the second petition; and (3) he was denied his constitutional right to confront and cross-examine witnesses when the Commonwealth failed to present two alleged eyewitnesses. The Commonwealth answered, conceding that federal waiver standards should apply, but asserting that this Court need not reach the question of whether Judge Spaeth correctly decided the waiver issue because petitioner's substantive claim was patently frivolous.

In accordance with the local rules of this Court, the matter was referred to United States Magistrate Edwin E. Naythons, who, on June 8, 1972, filed a report. Magistrate Naythons concluded that the record before the state courts did not provide sufficient evidence from which a finding could be made as to whether, under federal waiver standards, petitioner's failure to raise the confrontation issue at an earlier stage constituted a waiver of his right to litigate that issue. He recommended that an evidentiary hearing be had with respect to this issue. Magistrate Naythons also raised in his report an issue *not* raised by the petitioner in the present petition, that of ineffective assistance of counsel. Having reviewed the trial record and the transcript of the PCHA hearing before Judge Greenberg, Magistrate Naythons was disturbed about a number of aspects of Mr. Quinlan's representation, with particular emphasis on his minimal contact with petitioner prior to trial and the inadequacy of his preparation and cross examination. Accordingly, he recommended that the evidentiary hearing address this issue as well.

■ Upon receipt of Magistrate Naythons' report we made an independent review of the transcript of the trial and of the PCHA hearing. For reasons which will appear, *infra,* consonant with the findings of Judges Greenberg and Kraft, we did not concur with Magistrate Naythons' view that the record reflected performance by Mr. Quinlan below the "normal competency" standard of Moore v. United States, 432 F.2d 730

(3d Cir. 1970).[2] However, we felt that the record revealed a potentially serious problem stemming from the fact that petitioner had no means of communicating with his attorney, Mr. Quinlan, when the lone court interpreter present at petitioner's trial translated the testimony of Ocasio and Pacheco from Spanish to English for the benefit of the trial judge. Since the testimony of Ocasio and Pacheco was critical to the Commonwealth's case, and since there was at least a question as to the adequacy of Mr. Quinlan's cross-examination, we felt that an evidentiary hearing was in order to determine whether or not the possible breakdown in communication between petitioner and his counsel at that juncture affected petitioner's constitutional rights to effective counsel, due process and/or confrontation.[3] Accordingly, although noting that we were not in sub-

2. Even though the case was tried and the PCHA proceedings were held before *Moore* was decided, we assume that the *Moore* standard is applicable to this case.

3. There are surprisingly few reported decisions dealing with the right of an accused to an interpreter and the source, nature and extent of that right. An excellent collection of those decisions is found in an annotation "Accused—Right to Interpreter," 36 A.L.R. 3d 276.

It appears from the A.L.R.3d compendium that there has been no consistency in the approach which courts have taken with respect to the issue. Reflecting the cross currents within the cases, the annotator observed:

> There is no federal constitutional right, as such, requiring the assistance of a court-appointed interpreter to supplement an accused's right to counsel, and rarely a state constitutional provision expressly requiring interpretation for an accused. The courts have recognized, however, that where the accused in a criminal proceeding is so unfamiliar with the English language that he cannot communicate his statements or testimony, or cannot understand the testimony or statements of others involved in the proceedings, he is entitled, as a matter of constitutional right, to be furnished the assistance of an interpreter.
>
> Recognizing that an accused has no absolute right to have the evidence or court proceedings interpreted, and that the constitutional right of confrontation is not denied an accused whose counsel understands the testimony, either in the language used by the witnesses or as translated into English, the courts follow the general rule that the appointment of an interpreter for the accused is a matter resting in the discretion of the trial court. However, it has been said that the danger of mistakes in legal proceedings is such that nothing but practical necessity can justify the intervention of an interpreter between counsel and witness or between witness and jury, and it is well settled that there is a duty on the trial court to make an informed determination as to the necessity of appointing an interpreter for the accused. (footnotes omitted).

In general, the decisions which have found constitutional problems where an interpreter was not appointed have spoken in terms of confrontation or due process. Garcia v. State, 151 Tex.Cr.R. 593, 210 S.W.2d 574 (1948), reversed a conviction on confrontation grounds because the trial court had failed to appoint an interpreter. The appeals court stressed that the constitutional right of confrontation, embodies the right of cross examination which cannot meaningfully be exercised unless the accused, through an interpreter, is afforded knowledge of the witness's testimony against him. *See also* State v. Vasquez, 101 Utah 444, 121 P.2d 903 (1942). In re Muraviov, 192 Cal.App.2d 604, 13 Cal.Rptr. 466 (1961) reversed a conviction on due process grounds where no interpreter had been appointed, and where the accused's knowledge of English was minimal or non-existent, as did Parra v. Page, 430 P.2d 834 (Okl.Cr.1967).

The most significant case in the area, United States ex rel. Negron v. State of New York, 434 F.2d 386 (2d Cir. 1970), also turned on due process grounds. Negron, a 23-year old Puerto Rican American with a sixth grade education, was charged with murder. At jury trial he was found guilty of murder in the second degree and was sentenced to from twenty years to life in prison. Negron neither spoke nor understood English, and his court-appointed lawyer spoke no Spanish. Counsel and client thus could not communicate without the aid of an interpreter. Twelve of the state's fourteen witnesses testified in English. The testimony of the two Spanish-speaking witnesses was translated into English for the benefit of the Court, counsel and jury by an interpreter employed by the prosecution. In addition to translating for Negron the trial court's instructions with respect to the right to make preemptory challenges at the beginning of the trial, the interpreter met with Negron and his counsel

for some ten to twenty minutes during two brief recesses in the course of the four-day trial and summarized the testimony of those witnesses who had already testified. When the interpreter was not translating Spanish to English for the court she was not present in the courtroom, hence she did not translate English testimony for Negron while the trial was in process. On a petition for habeas corpus, the district court granted relief, holding that Negron's trial lacked the basic and fundamental fairness required by the Due Process Clause of the Fourteenth Amendment. In affirming, Judge Kaufman observed:

> But the right that was denied Negron seems to us even more consequential than the right of confrontation. Considerations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at his own trial, see, e.g., Lewis v. United States, 146 U.S. 370, 372, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), unless by his conduct he waives that right. See, e.g., Illinois v. Allen, 397 U.S. 337, 90 S. Ct. 1057, 25 L.Ed. 353 (1968). And it is equally imperative that every criminal defendant—if the right to be present is to have meaning—possesses "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1962) (per curiam). Otherwise, "[t]he adjudication loses its character as a reasoned interaction . . . and becomes an invective against an insensible object." Note, Incompetency to Stand Trial, 81 Harv.L. Rev. 454, 458 (1969).

> However astute Mrs. Magginpinto's summaries may have been, they could not do service as a means by which Negron could understand the precise nature of the testimony against him during that period of the trial's progress when the state chose to bring it forth. Negron's incapacity to respond to specific testimony would inevitably hamper the capacity of his counsel to conduct effective cross-examination. Not only for the sake of effective cross-examination, however, but as a matter of simple humaneness, Negron deserved more than to sit in total incomprehension as the trial proceeded. Particularly inappropriate in this nation where many languages are spoken is a callousness to the crippling language handicap of a newcomer to its shores, whose life and freedom the state by its criminal processes chooses to put in jeopardy.

434 F.2d at 389–390 (footnotes omitted).

*Negron's* importance also lies in its emphasis upon the interpreter as a vehicle for communication between client and counsel in addition to mere understanding by the defendant of the testimony. *See also* Atilus v. United States, 378 F.2d 52 (5th Cir. 1967) where the presence of an interpreter was not conclusive on the question of defendant's understanding of the proceedings, and Terry v. State, 21 Ala.App. 100, 105 So. 386 (1925), where the right to an interpreter was extended to a deaf mute.

A bill was recently introduced in the Congress to establish bilingual judicial systems in federal district courts with significant non-English speaking populations. In introducing the bill, its principal sponsor, Senator John Tunney, noted:

> Only through the aid of simultaneous translation will the party be able to communicate with his attorney so that the latter may effectively cross-examine English-speaking witnesses, to test their credibility, their memory and their accuracy.

Senator Tunney's comment underscores the confrontation problem.

In the ordinary course, we would not discourse upon the problem of the constitutional right to an interpreter other than to note its existence and to explain the reason we ordered an evidentiary hearing in the first place. Moreover, any view which we express would be dictum. However, since we have been concerned with this subject for many years, and because of the pendency of Senator Tunney's bill, we felt constrained to review the current state of the law and to make several observations. First, we note our concurrence with Judge Kaufman's analogy between the presence of an interpreter and the presence of the accused at his own trial. Second, we underscore the constitutional importance of the ability of the accused to consult with his lawyer with a "reasonable degree of rational understanding." Third, we believe that, in cases to come, the courts will recognize the implications of the constitutional problem when an interpreter is not present. And fourth, we feel it important to note one aspect of the matter not heretofore given much attention: the case may well arise where the defendant's constitutional rights may require the presence of *two* interpreters. Such a situation might have arisen in the present case during the period when the court interpreter was translating the testimony of the Spanish-speaking witness for the benefit of the Court, at which time Navarro was unable to communicate with his lawyer. Such situations are likely to occur in long trials where credibility is the central issue, where cross-examination of witnesses speaking in the foreign tongue is therefore critical, but where interruption of the testimony (as in

stantive agreement with the position taken by Magistrate Naythons in his report, we concurred in his recommendation that we hold an evidentiary hearing.[3a]

■ The hearing was held on March 5, 1973 and a Spanish-speaking interpreter was present.[4] Petitioner was represented by Stanford Shmukler, Esq., one of Philadelphia's ablest criminal defense lawyers. During the course of the hearing, we granted petitioner leave to amend his petition to raise as a ground for relief the claim that he had been denied the effective assistance of counsel because of inadequate preparation and performance by Mr. Quinlan. Our concern prior to the hearing was that while the Spanish-speaking witnesses were testifying, petitioner would have no means of communicating with his English-speaking lawyer, Mr. Quinlan. We wondered whether petitioner could comment to his lawyer about the witnesses' testimony, point out inconsistencies with the facts if they occurred and make suggestions as to questions to be asked. In the present case, petitioner was able to follow the proceedings when the Spanish-speaking witnesses, Ocasio and Pacheco, were testifying. While the English-speaking witnesses were testifying, the interpreter sat with him to explain what they were saying. The evidence adduced at the hearing established that petitioner had no complaint about inability to confer with his lawyer during trial, for when petitioner required it, Judge Spaeth permitted interruption of the proceedings so that petitioner could confer through the interpreter. For the most part, petitioner did not require it. Accordingly, no claim of the type we are discussing was pressed and

we deem it abandoned. The testimony at the hearing before this Court, therefore, was devoted exclusively to the general ineffective assistance issue, as well as to the questions of whether petitioner exhausted his state remedies and whether he had deliberately by-passed the ineffective assistance issue in the state courts.

### III. *Exhaustion of State Remedies*

■ The Commonwealth vigorously asserts that the petition must be dismissed because petitioner has failed to exhaust available state remedies, including *nunc pro tunc* appeals which are generally allowed by the Pennsylvania state courts. In pressing its exhaustion claim, the Commonwealth has noted: (1) that in the very first post-trial proceeding, the PCHA hearing before Judge Greenberg, the petitioner asserted and developed an extensive record on what we shall refer to as general ineffective assistance of counsel, *i. e.*, lack of preparation and inadequate performance in general; (2) that at post-trial motions before Judge Spaeth, petitioner raised the question of the ineffectiveness of trial counsel for failing to adequately present the evidence to Judge Spaeth and for failing to request a summation; but (3) that on appeal from the denial of post-trial motions, the only ineffective assistance claim raised by petitioner related to counsel's failure to request summation. In the wake of this procedural history, the Commonwealth argues that petitioner's claim of general ineffective assistance of counsel has never been presented to the Pennsylvania appellate courts, and that he has an available state remedy open to him. The Commonwealth contends that petitioner

---

the present case) is impractical. Unless a second interpreter is somehow furnished, the defendant's incapacity to respond to specific testimony will "inevitably hamper the capacity of his counsel to conduct effective cross-examination." *See* United States ex rel. Negron v. State of New York, *supra.*

**3a.** It should be noted that Magistrate Naythons did recognize in his report that problems were indeed created by the difficulties in communication between petitioner and his trial counsel.

**4.** The interpreter was Julio Sanjenis, official interpreter for the Court of Common Pleas, who was the interpreter at petitioner's trial.

could make a *nunc pro tunc* appeal from the denial of post-conviction relief or appeal from Judge Spaeth's order denying his post-trial motions. We disagree and find that the Pennsylvania courts would consider that petitioner had finally litigated the ineffective assistance claim.

In the case of Commonwealth v. Wilson, 431 Pa. 21, 244 A.2d 734 (1968), cert. denied, 393 U.S. 1102, 89 S.Ct. 901, 21 L.Ed.2d 794 (1969) (*Wilson I*), the appellant was convicted of first degree murder and sentenced to life imprisonment. On his direct appeal to the Pennsylvania Supreme Court, he raised eleven contentions, including ineffective assistance, which was couched principally in terms of trial counsel's failure to object to a large number of questions (*Wilson I, supra*). In a subsequent PCHA petition, Wilson raised a fundamentally different ineffective assistance claim, contending: (1) that his counsel's representation of a codefendant in a separate trial for the same offense constituted a conflict of interest which deprived him of constitutionally guaranteed effective assistance of counsel; and (2) that during his trial his attorney did not conduct a voir dire examination of certain minor witnesses who testified for the Commonwealth to determine if they were competent to testify.[5] The PCHA court denied relief and Wilson appealed.

In Commonwealth v. Wilson, Pa., 305 A.2d 9 (1973) (*Wilson II*), the Pennsylvania Supreme Court held that there was no need to examine the merits of Wilson's contention, since the issue of trial counsel's competency had already been "finally litigated" within the terms of the PCHA. Mr. Chief Justice Jones, speaking for a unanimous court, wrote:

> In his initial direct appeal the appellant argued that he had been denied effective assistance of counsel at trial.

We reviewed the record and ruled that the appellant received "competent assistance of counsel rendered by an experienced trial lawyer." In this petition the appellant has advanced a *new theory* in support of his previously litigated contention that he did not receive adequate assistance of counsel. However, as we stated in a similar situation in Commonwealth v. Slavik, 449 Pa. 424, 430, 297 A.2d 920, 923 (1972): "merely because [appellant] advances a *new or different theory* as a basis for his previously adjudicated claim does not alter the fact that this precise *issue* was decided adversely to petitioner in his previous . . . direct appeal." The appellant raised the issue of the competence of his trial counsel on his direct appeal and that issue was decided adversely to the appellant. The issue is now finally litigated under the terms of the statute and cannot be reopened merely by asserting another theory upon which incompetence could be founded.

*Wilson II, supra* at 11 (footnotes omitted) (emphasis added).

In the direct appeal in the case at bar, petitioner raised the question of whether counsel was ineffective for failing to request summation. The trial transcript consisted of only 34 pages, and both the Supreme and Superior Courts had that record before them in deciding the case. Those courts doubtless also had the transcript of the PCHA hearing before Judge Greenberg which had been held prior to (and gave rise to) the direct appeal; the PCHA record totals 32 pages. We are confident that in the circumstances of this case the Pennsylvania appellate courts, following the precedent of *Wilson II*, would hold that petitioner, having raised the ineffective assistance claim in one aspect could not now raise a new or different theory of ineffective

---

5. Counsel had conducted such an examination of the same minor witnesses when they testified for the Commonwealth at the trial of the co-defendant, which was held prior to the appellant's trial. The minors were found competent to testify in the earlier trial.

assistance.[6] Thus, petitioner has no state remedies remaining.

## IV. *Deliberate By-Pass*

In an alternative argument, the Commonwealth has asserted that the history of petitioner's prior appeals and attempts at collateral relief demonstrate a deliberate by-pass of state procedures available for the litigation of the ineffective assistance question. Had there been an available state remedy, we would have been bound, under the teaching of United States ex rel. Johnson v. Cavell, 468 F.2d 304 (3d Cir. 1972) to withhold a hearing on the waiver issue asserted by the Commonwealth and to remand the matter to the state court where such a hearing could be held.[7] There being no available state remedy, it was necessary for us to take evidence to determine the validity of the Commonwealth's contention that petitioner had deliberately by-passed his state remedies, thus forfeiting his federal claim.

█ Under the "deliberate by-pass" doctrine, as it is known, if the petitioner deliberately sought to subvert or evade orderly adjudication of his federal defenses in the state courts, then the federal court has a "limited discretion" to find that petitioner deliberately by-passed his state remedies. *See generally* Sokol, Federal Habeas Corpus, 2d Ed.

1969; Fay v. Noia, 372 U.S. 391, 83 S. Ct. 822, 9 L.Ed.2d 837 (1963). This means that the petitioner is forever barred from raising his contention in a federal court by way of habeas corpus. A deliberate by-pass is thus judicially-created doctrine in the nature of a forfeiture. *See* Sokol, Federal Habeas Corpus, 2d Ed. p. 167.

Since the forfeiture of the opportunity to assert a federal constitutional right is somewhat harsh, the criteria for establishing a deliberate by-pass are strict. Mr. Justice Brennan, speaking for the court in *Fay* observed:

> The classic definition of waiver enunciated in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461—*"an intentional relinquishment or abandonment of a known right or privilege"—furnishes the controlling standard. If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of*

---

6. Our reading of *Wilson II* is unaffected by footnote 4 therein which reads:

> 4. Not only was the issue of the competence of trial counsel considered in the appellant's first appeal, but the very issue of counsel's failure to conduct a voir dire examination of the minor witnesses to determine competence was specifically treated. As Mr. Justice O'Brien stated in the opinion disposing of the appellant's direct appeal: "While we are of the opinion that the safest course would have been to conduct a formal voir dire, we fail to see how appellant was prejudiced by the procedure followed here. The testimony of the witnesses revealed them to be competent . . . ." Commonwealth v. Wilson, 431 Pa. 21, 31, 244 A.2d 734, 739–740 (1968).

The Commonwealth has argued that *Wilson II* is distinguishable because of Mr. Chief Jus-

tice Jones' notation that the issue raised on the appeal from the PCHA petition was directly disposed of on the direct appeal. To so interpret *Wilson II* would be to render nugatory its plain language. Indeed, what the Commonwealth is contending is that the Supreme Court has announced an important principle (indeed in trenchant terms) and has then in the same breath erased it, much in the manner of the Reverend Pere Gaucher in Daudet's famous tale, L'Elixir du Reverend Pere Gaucher, one of the "Lettres de mon Moulin" (Letters From My Windmill). Such a contention is not entitled to credence.

7. The *en banc* opinion in *Johnson* supplanted the panel opinion which held that the waiver (by-pass) hearing should be held in the district court. At the time that Magistrate Naythons filed his report, the *en banc* opinion had not yet been filed.

course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. Cf. Price v. Johnston, 334 U.S. 266, 291, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356. At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. Cf. Carnley v. Cochran, 369 U.S. 506, 513–517, 82 S. Ct. 884, 888–891, 8 L.Ed.2d 70; Moore v. Michigan, 355 U.S. 155, 162–165, 78 S.Ct. 191, 195–197, 2 L.Ed.2d 167. *A choice made by counsel not participated in by the petitioner does not automatically bar relief.* Nor does a state court's finding of waiver bar independent determination of the question by the federal courts on habeas, for waiver affecting federal rights is a federal question.

372 U.S. at 439, 849 (emphasis added).

United States ex rel. Johnson v. Cavell, *supra,* dealt with the proper interpretation of the waiver standard in section 4 of the PCHA.[8] At rehearing before the Court *en banc* (see note 7), the Commonwealth reversed the position it had taken before the panel and conceded that the proper construction of section 4(c) of the PCHA is that it merely places upon the petitioner the burden of pleading and proving that his failure to raise an issue in a prior proceeding was not a knowing and understanding by-pass. The Court agreed that such an interpretation was consistent with Fay v. Noia, holding as had the panel, that, while the statute uses the word "presumption," it actually deals only with burden of pleading and burden of proof, and further that the contrary interpre-

tation would render section 4 unconstitutional.

Based upon the evidence adduced at the March 5, 1973 hearing, we find that petitioner has established that he did not knowingly and understandingly bypass state remedies. That evidence shows that petitioner spoke little or no English, had no education beyond the second grade (in Puerto Rico), has worked as a common laborer all his life, and did not at any time discuss with his counsel the nature of the post conviction remedies to be followed. Indeed, he had no interpreter present when he spoke with Mr. DiQuinzio, who did not speak Spanish. We find no actual or constructive notice of the provisions of the PCHA; although those provisions are printed on the back of the form which every PCHA petitioner must complete, petitioner could not read English. Moreover, we can find no strategic or tactical benefit which the petitioner would derive from a by-pass of state procedures. See United States ex rel. Linde v. Brierley, 437 F.2d 324 (3d Cir. 1970). In short, we find no "considered choice" by petitioner not to assert the ineffective assistance claim with constancy in the state courts.

The Commonwealth argues that personal participation by the client in a decision to forego a state's procedural requirement is not always necessary. Judge Aldisert's comments in the panel opinion in *Johnson* are apposite here:

To be sure, the personal participation by the client in a decision to forego a state's procedural requirements is not always necessary. Fay v. Noia indicated as much by its statement that an attorney's decision, in the absence

---

8. Section 4 provides:

(b) "For the purposes of this act, an issue is waived if:

(1) The petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas-corpus proceeding or any other proceeding actually conducted, or in a

prior proceeding actually initiated under this act; and

(2) the petitioner is unable to prove the existence of extraordinary circumstances to justify his failure to raise the issue.

(c) There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure.

of his client's personal participation, "does not *automatically* bar relief." (Emphasis supplied.) Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), although arising in the context of a direct appeal, emphasized the possible binding effect of counsel's considered decision involving trial strategy or tactics.

> Although trial strategy adopted by counsel without prior consultation with an accused will not, where the circumstances are exceptional, preclude the accused from asserting constitutional claims . . ., we think that the deliberate bypassing by counsel of the contemporaneous objection rule as a part of trial strategy would have that effect in this case.

*Id.* at 452, 85 S.Ct. 564. Because there are too many trial decisions that must, of necessity, be left to the professional competence of counsel, "the *Fay* holding on this point must be limited to the specific decision of whether or not to waive basic procedural rights, such as the appellate process." Thus, the "question of the general necessity of a personal waiver has been left open." Note, "Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest," 54 Calif.L.Rev. 1262, 1267 (1966). In his perceptive and thoughtful article, Gibbons, "Waiver: The Quest for Functional Limitations on Habeas Corpus Jurisdiction," 2 Seton Hall L.Rev. 291, 297 (1971), Judge Gibbons argues that "[w]ith [some rights], or at other stages in the criminal justice proceeding, prophylactic policies may militate against the recognition of even personal participatory waivers." But he does acknowledge that "[a] personal, knowledgeable, participatory decision may be a perfectly valid precondition *to the waiver of the right to collaterally attack a judgment* entered after a violation of certain federal constitutional rights at some stages in a proceeding." (Emphasis supplied.) This is, of course, the precise waiver issue at stake in the present appeal.

 The many cases cited by the Commonwealth in its brief on this point deal with tactical trial decisions by counsel. But what is really involved is something quite different, waiver (indeed forfeiture) of the right to collaterally attack a judgment because of the deliberate by-pass doctrine. We accept the validity of Judge Gibbons's "acknowledgment" and Judge Aldisert's commentary and hold that a personal knowledgeable participatory decision is a valid precondition to such waiver. Having found that petitioner has met his burden of proving that there was no such personal knowledgeable participatory decision here, the deliberate by-pass claim must be denied. We turn then to the merits of petitioner's claim.[9]

---

9. As we have pointed out in the text, petitioner's first federal habeas petition alleged that trial counsel was ineffective for failure to demand the right of summation. Judge Kraft, in his memorandum and order denying the petition stated:

> After examination of the state court trial records and the state post-conviction hearing record, we find that relator was effectively represented by his appointed counsel.

The principle of *res judicata* is not, of course, applicable in habeas corpus proceedings. *See* Sanders v. United States, 373 U.S. 1, 7–8, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Moreover, as we see it, the "law of the case" principle as enunciated in this circuit in United States v. Wheeler, 256 F.2d 745 (3d Cir. 1958), and T.C.F. Film Corp. v. Gourley, 240 F.2d 711 (3d Cir. 1957) is inapposite both on the facts of those cases vis-a-vis this one and on the law. However, the Commonwealth has also asked us to refrain from entertaining petitioner's ineffective assistance claim because of 28 U.S.C. § 2244 (b) which provides:

> When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an appli-

## V. *Ineffective Assistance of Counsel*

Petitioner's ineffective assistance claim is two-pronged. First, he claims that his trial counsel was inadequately prepared for trial; and secondly, he complains of counsel's inadequate performance, particularly in overlooking or ignoring basic trial tactics. The controlling standards in evaluating ineffective assistance claims are furnished by Moore v. United States, 432 F.2d 730 (3d Cir. 1970), and *Moore* makes both adequacy of preparation and adequacy of performance relevant concerns. We shall take these two aspects up separately, setting forth our findings of fact and then our legal conclusions with respect to each. The findings stem from the evidence developed at the hearing before us and at the hearing before Judge Greenberg, since Mr. Quinlan testified that his recollection of the facts was far clearer at that time.

### A. *Inadequate Preparation*

■ Petitioner did not meet his trial counsel, Mr. Quinlan, until the morning of trial, and he spoke to him only briefly (for about five minutes). However, we find that at that time, Mr. Quinlan had in his possession and had carefully reviewed the Defender Association file which contained *inter alia* the results of an interview with petitioner conducted earlier in the presence of an interpreter,

and a report by the Defender Association's investigative staff of an interview with Pacheco, one of the petitioner's victims. The alleged failure of the Defender Association to produce two of petitioner's relatives as witnesses is rendered meaningless by petitioner's testimony at the hearing before us that they could not possibly have seen the occurrence. Moreover, investigators from the Defender staff had attempted to locate petitioner's relatives at least two and probably three times, but were unable to do so. In addition to the foregoing, the Association investigated the criminal records of two of the prosecution witnesses. And Mr. Quinlan spoke to one of the arresting officers prior to the trial, but characterized his testimony as "disastrous" from the point of view of the defense.

■ Judge Freedman, speaking for the Court in *Moore*, observed:

Adequate preparation for trial often may be a more important element in the effective assistance of counsel to which a defendant is entitled than the forensic skill exhibited in the courtroom.

432 F.2d at 735. He added that:

representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel

---

cation for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained· by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ.

While it is true that Judge Kraft did not hold an evidentiary hearing, he may have (and could have) considered the record of the PCHA hearing on the point. But although he may have, we cannot be certain that he

did, and neither are we satisfied that petitioner has abused the writ. Since we had determined to hold a hearing to consider the ineffective assistance or confrontation or due process claim respecting possible inability to communicate with counsel because of the lack of a second interpreter (see text at p. 683 and in note 3, *supra*), we were not inclined to deny the amendment to interpose the ineffective assistance claim when the claim we thought we would hear was abandoned at the hearing. At this juncture, having heard the evidence supporting the general ineffective assistance claim, we are not disposed to refuse to "entertain" it under 28 U.S.C. § 2244(b) inasmuch as the full contours of Judge Kraft's deliberations are not visible of record.

has neglected the necessary investigation and preparation of the case or failed to interview the essential witnesses or to arrange for their attendance.

432 F.2d at 739. The adequacy of preparation question must be addressed however in terms of the controlling standard of the adequacy of legal services, that of "normal competency" as announced in *Moore, i. e.,* "the exercise of the customary skill and knowledge which normally prevails at the time and place." *Moore, supra* at 736. The standard does not vary whether an indigent is represented by an individual or an institution such as the Defender Association.

While this is not a "late appointment" case as such, it is akin to the late appointment cases insofar as those cases generally concern adequacy of preparation.[10] The language of Judge Rosen in United States v. Junne, 458 F.2d 1156 (3d Cir. 1972) is apposite:

> In applying this [normal competency] standard, the time of appointment of counsel should not be seen *in vacuo,* but rather should be viewed in light of all the "attendant circumstances" [citing *Moore,* 432 F.2d at 735]. Paramount among these circumstances are the preparation difficulties of a

case and the experience of a particular lawyer.

458 F.2d at 1158.[11]

While Mr. Quinlan was not an experienced trial lawyer at the time, having very recently graduated from law school, he had endured a baptism of fire by trying some thirty-eight cases during his first trial week with the Defender Association and this was his thirty-ninth case. We find that the extent of preparation reflected by the Defender Association file met the *Moore* normal competency standard, and that Mr. Quinlan's personal preparation for trial was also up to the *Moore* standard. We turn then to the question of the adequacy of his performance.

## B. *Inadequate Performance*

 Petitioner asserts that Mr. Quinlan committed many serious errors in terms of trial performance or tactics. These may be enumerated as follows: (1) failing to cross-examine the detective as to the location of the bloodstain, the manner in which it could be connected with the crime or even discovered;[12] (2) failing to cross-examine about the discrepancy between the versions of Ocasio and Pacheco,[13] and to determine

10. Moore v. United States, *supra,* held that the timeliness of appointment of counsel when the Public Defender represents a defendant must be measured by the time the Defender is appointed by the Court and not the time the particular trial lawyer is assigned to the case. The precise time at which the Defender Association's representation of petitioner began is not clear. The defender's file has apparently been lost. The best inference that can be drawn is that the Defender Association began representing petitioner at the preliminary hearing, for the record reflects that the Defender Association filed a motion for an immediate preliminary hearing on petitioner's behalf. Under the circumstances of this case, the ineffective assistance claim cannot be grounded upon late appointment of counsel.

11. In United States v. Junne, 458 F.2d 1156 (3d Cir. 1972), although counsel was not ap-

pointed until two days prior to the trial, the court held that "in this comparatively simple case two days was adequate time for Junne's counsel to prepare his defense . . . ."

12. The event occurred at 1:30 a.m. but the detective did not arrive on the scene until 3:30 a.m.

13. Ocasio testified that he first met the petitioner in the bar and that petitioner followed him and Pacheco out, cut Pacheco first, and then cut Ocasio. Ocasio also testified that he had a bottle which he threw at petitioner. On the other hand, Pacheco testified that petitioner had a knife 7 or 8 inches long, that he cut Ocasio first, and then came after him. Pacheco testified that a bottle had been taken away from petitioner but said nothing about a bottle in the possession of Ocasio.

whether a third person was present; [14] (3) failing to object to the detective's testimony that another officer had found a butcher knife at the scene with a 6½ inch blade, although the actual knife was not introduced; [15] (4) failing to move for sequestration of witnesses; (5) failing to make closing argument; and (6) failing to utilize the criminal record of one witness for impeachment purposes.

In addressing the claim relating to failure to cross-examine, we note that the case turned principally on the credibility of the witnesses. It was a case of direct, not circumstantial evidence. In view of this fact, the failure of counsel to extend cross-examination may well have been motivated by defense counsel's fear that a strong showing by the cross-examinee might well have been fatal to his case. [16] Indeed, Judge Spaeth in his opinion found that "[t]he differences in the testimony of Juan Ocasio and Robert Pacheco are insignificant," and he rejected petitioner's testimony as untrue. Since in a criminal case the Commonwealth has a strong burden to overcome the presumption of innocence, Mr. Quinlan might well have thought he had a better chance of success by virtue of the conflicting versions alone.

. The failure to object to the reference to the knife on the other hand does not appear to have any significance in the overall record; we do not presume that so able a judge as Judge Spaeth credited or made findings based upon hearsay evidence, and since the defendant admitted

to having a knife anyhow, we cannot perceive any prejudice in the offer.

The argument that Mr. Quinlan was inadequate because he failed to move for sequestration is unpersuasive; the critical prosecution witnesses, Ocasio and Pacheo, could not understand the English-speaking witnesses anyway and insofar as Pacheco heard Ocasio testify (Ocasio went first), that experience did not eliminate the discrepancies between them on which petitioner so heavily relies. Hence it is hard to see where petitioner was prejudiced. In any event, we have been cited no authority to the effect that failure to move for sequestration is a symptom of ineffective assistance of counsel.

Moreover, the contention based upon Mr. Quinlan's failure to make closing argument must be measured against the brevity of the trial. We agree with Judge Kraft that a trial with a 34-page transcript is so short as not to require closing argument.

The contention that Mr. Quinlan was ineffective because he failed to impeach prosecution witnesses with their criminal records finds no support on the record. This contention relates particularly to Ocasio, but his only convictions were for drunk driving and lottery which would not qualify for impeachment purposes under Pennsylvania law. [17]

We have already enunciated the *Moore* "normal competency" standard. Indeed, the contentions of petitioner as to counsel's performance are put in best perspective by the eloquent language of

---

14. Petitioner testified that there were three men, one of whom threw a bottle at him first.

15. Petitioner testified that he used only a small penknife to defend himself.

16. In terms of the cross-examination which he did pursue, we note that Mr. Quinlan explored the potential ambiguities with regard to who did the chasing into the house where the state claimed some stabbing took place, a most important point. We also note that Mr. Quinlan had already interviewed a police

officer whose testimony Mr. Quinlan believed would have been devastating.

17. Petitioner also complains that Mr. Quinlan neglected to point out to Judge Spaeth that the indictment No. 5584, charging the offense against Joseph Pacheco, charged that it occurred on April 4, 1966, while the other indictment charged that the offense occurred on April 16, 1966. The evidence related to April 16, 1966. We do not discuss this further because it is plain that this variance could have been amended (see Pa.R.Crim.P. 220, 19 P.S.Appendix).

Judge Freedman, speaking for the *Moore* court:

> A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in the professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances . . . [I]t is proverbial that the finest ideas emerge on the way back from the courthouse. The advocate's work, therefore, is not readily capable of later audit like a bookkeeper's . . . Review may disclose failures at the trial . . . . But since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case.

What Judge Freedman addressed is what is involved here. The Commonwealth does not contend that Mr. Quinlan's representation was perfect or even that it would necessarily receive high marks, but it does argue that the representation does meet the *Moore* standard of "normal competency." Based upon the foregoing facts, we agree. And while it is not a basis for our decision, it gives us added confidence that the trial judge, Judge Spaeth, is considered by us (and the bench and bar at large) as having been one of the finest trial judges in Pennsylvania.[18]

Having thus concluded (as did Judges Greenberg and Kraft) that petitioner was not denied the effective assistance of counsel at trial, we enter the following Order.

### ORDER

And now, this 4th day of October 1973, it is ordered that the petition of Santos Navarro for a writ of habeas corpus is denied on the merits. There is no probable cause for appeal.

---

18. Judge Spaeth is now a member of the Pennsylvania Superior Court.